# ST. MARTIN EVANGELICAL LUTHERAN CHURCH
## ET AL. *v.* SOUTH DAKOTA

No. 80–120.   Argued March 3, 1981—Decided May 26, 1981

BLACKMUN, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, WHITE, MARSHALL, POWELL, and REHNQUIST, JJ., joined. STEVENS, J., filed an opinion concurring in the judgment, *post*, p. 788.

*Edward Thomas Schilling* argued the cause for petitioners. With him on the briefs was *Ernst J. von Briesen.*

*Mark V. Meierhenry,* Attorney General of South Dakota, argued the cause for respondent. With him on the brief was *Judith A. Atkinson,* Assistant Attorney General.

*Allen R. Snyder* argued the cause for the State of Alabama et al. as *amici curiae* urging reversal. With him on the brief were *Charles A. Graddick,* Attorney General of Alabama, *Richard H. Bryan,* Attorney General of Nevada, *Stuart Philip Ross, Peter W. Tredick, George Cocoris,* and *John A. Flangas.*

*Barry Sullivan* argued the cause for the United States as *amicus curiae* urging affirmance. On the brief were *Solicitor General McCree, Acting Assistant Attorney General Martin, Deputy Solicitor General Wallace, Alan I. Horowitz, Mark C. Rutzick, F. James Foley, Nathaniel Baccus III, Lois G. Williams,* and *Joseph M. Woodward.*[*]

---

[*]Briefs of *amici curiae* urging reversal were filed by *George Deukmejian,* Attorney General, *Arthur C. deGoede,* Assistant Attorney General, and *Lawrence K. Keethe* and *Jefferey M. Vesely,* Deputy Attorneys General, for the State of California; by *Lee Boothby* and *Robert W. Nixon* for Americans United for Separation of Church and State; by *William B. Ball, Philip J. Murren,* and *Robert L. Toms* for the Association of Christian Schools International et al.; by *Henry W. Sawyer III* for the Germantown Friends School et al.; by *David C. Gibbs, Jr.,* and *Charles E. Craze* for the Grace Baptist Temple et al.; and by *Wilfred R. Caron, Charles M. Whelan, George E. Reed, Gerald C. Tobin,* and *John A. Liekweg* for the United States Catholic Conference.

Briefs of *amici curiae* were filed by *Nathan Z. Dershowitz* for the

774

JUSTICE BLACKMUN delivered the opinion of the Court.

Petitioners, St. Martin Evangelical Lutheran Church (St. Martin), at Watertown, S. D., and Northwestern Lutheran Academy (Academy), at Mobridge in that State, claim exemption with respect to their school employees from taxes imposed by the Federal Unemployment Tax Act (FUTA), 26 U. S. C. §§ 3301–3311 (1976 ed. and Supp. III), and by South Dakota's statutes complementary thereto, S. D. Codified Laws § 61–1–1 *et seq.* (1978 and Supp. 1980). The exemption is claimed on both statutory and First Amendment grounds. The provisions primarily at issue are FUTA's § 3309 (b) [1] and South Dakota's § 61–1–10.4.[2]

---

American Jewish Congress and by *Charles Alan Siegel* for the Lutheran Church-Missouri Synod.

[1] Title 26 U. S. C. § 3309 (b) reads in pertinent part:

"This section shall not apply to service performed—

"(1) in the employ of (A) a church or convention or association of churches, or (B) an organization which is operated primarily for religious purposes and which is operated, supervised, controlled, or principally supported by a church or convention or association of churches;

"(2) by a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry or by a member of a religious order in the exercise of duties required by such order. . . ."

[2] This South Dakota statute provides:

"For the purposes of §§ 61–1–10.2 and 61–1–10.3 the term 'employment' does not apply to service performed:

"(1) In the employ of

"(a) a church or convention or association of churches, or

"(b) an organization which is operated primarily for religious purposes and which is operated, supervised, controlled, or principally supported by a church or convention or association of churches; or

"(2) By a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry or by a member of a religious order in the exercise of duties required by such order; or

"(3) In the employ of a school which is not an institution of higher education prior to January 1, 1978 . . . ."

# I

## A

FUTA appeared originally as Title IX of the Social Security Act of 1935, 49 Stat. 639, and was enacted in response to the widespread unemployment that accompanied the Great Depression. It called for a cooperative federal-state program of benefits to unemployed workers.[3] The Act has undergone a series of amendments that progressively have expanded coverage of the Nation's work force.[4]

This case concerns one of the more recent of those amendments, namely, that effected by § 115 (b)(1) of the Unemployment Compensation Amendments of 1976, Pub. L. 94–566, 90 Stat. 2670. The Secretary of Labor has determined that this statute rendered nonprofit church-related primary and secondary schools subject to FUTA. The South Dakota authorities went along with that ruling in their interpretation of the State's amended statute. Petitioners are among those religiously affiliated schools so claimed to be required to pay the FUTA and South Dakota taxes. They contest this construction of the statutes. They argue also, however, that holding them subject to the taxes would violate both

---

[3] FUTA imposes an excise tax on "wages" paid by an "employer" in covered "employment," 26 U. S. C. § 3301, as these terms are statutorily defined. § 3306 (1976 ed. and Supp. III). An employer, however, is allowed a credit of up to 90% of the federal tax for "contributions" paid to a state fund established under a federally approved state unemployment compensation law. § 3302 (1976 ed. and Supp. III). The requirements for federal approval are contained in §§ 3304 and 3309 (1976 ed. and Supp. III), and the Secretary of Labor must annually review and certify the state plan. §§ 3304 (a) and (c) (1976 ed. and Supp. III). All 50 States have employment security laws implementing the federal mandatory minimum standards of coverage. A State, of course, is free to expand its coverage beyond the federal minimum without jeopardizing its federal certification.

[4] In response to each federal amendment, the States correspondingly have amended their statutes to retain their federal certifications.

the Free Exercise Clause and the Establishment Clause of the First Amendment.

B

Proper understanding of the effect of the 1976 amendment requires a review of FUTA's development. From 1960 to 1970, FUTA, by § 3306 (c)(8), unrestrictedly *excluded* from the definition of "employment" all "service performed in the employ of a religious, charitable, educational, or other organization described in section 501 (c)(3) which is exempt from income tax under section 501 (a)." Pub. L. 86–778, § 533, 74 Stat. 984.[5] Under this definition, nonprofit church-related schools, of course, were exempt from the tax. A 1970 amendment, however, served to narrow that broad exemption of nonprofit organizations.[6] See Employment Security Amendments of 1970, Pub. L. 91–373, § 104 (b)(1), 84 Stat. 697. The amendment generally required state coverage of employees of nonprofit organizations, state hospitals, and institutions of higher education. Simultaneously, however,

---

[5] From and after the effective date of the Internal Revenue Code of 1954 and until 1960, § 3306 (c)(8) related the exclusion to "service performed in the employ of a corporation, community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation." 68A Stat. 450.

[6] Inasmuch as the definition of "employment" in § 3306 (c)(8) continued to exclude service performed in the employ of an organization exempt from federal income tax under § 501 (c)(3), the 1970 amendment did not itself serve to impose a federal excise tax on nonprofit organizations. The amendment, however, as a condition for federal certification, required state statutes to cover employees of certain organizations of that type. § 3309 (a)(1)(A). Any covered nonprofit organization must be given the option of either making regular payments to the state unemployment fund or reimbursing the fund for benefits paid out to the organization's employees. § 3309 (a)(2). South Dakota amended its unemployment statutes accordingly. See 1971 S. D. Laws, ch. 276 (now codified, as further amended, as S. D. Codified Laws § 61–1–1 *et seq.* (1978 and Supp. 1980)).

Congress enacted a new and narrower exemption of nonprofit organizations and governmental entities. So far as pertinent to this case, that exemption was set forth in a new § 3309 (b), which then provided:

"This section shall not apply to service performed—

"(1) in the employ of (A) a church or convention or association of churches, or (B) an organization which is operated primarily for religious purposes and which is operated, supervised, controlled, or principally supported by a church or convention or association of churches;

"(2) by a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry or by a member of a religious order in the exercise of duties required by such order;

"(3) in the employ of a school which is not an institution of higher education . . . ."

No one, including the Secretary of Labor, disputes that church-run elementary and secondary schools remained exempt under this new § 3309 (b).

In 1976, Congress again amended the Act. Unemployment Compensation Amendments of 1976, Pub. L. 94–566, § 115 (b)(1), 90 Stat. 2670. The effect of the 1976 amendment, so far as pertinent to this case, was to eliminate completely the theretofore existing subsection (b)(3).[7] Subsections (b) (1) and (b)(2), dealing specifically with religious employment, remained unchanged.[8]

---

[7] In place of subsection (b)(3), Congress substituted a new and unrelated subsection (b)(3) that concerns the exemption of certain service in the employ of governmental entities. We continue herein to refer to the repealed subsection as "§ 3309 (b)(3)" or "(b)(3)."

[8] Following the 1976 amendment, South Dakota effected corresponding amendments of its unemployment compensation statutes. See 1977 S. D. Laws, ch. 420, §§ 9, 10, and 11 (codified as S. D. Codified Laws §§ 61-1-10.3 and 61-1-10.4 (1978)). Petitioners were ruled to be liable for state taxes under these provisions.

In 1978, the Secretary of Labor announced, in a letter made public, that the 1976 repeal of § 3309 (b)(3) of FUTA was

"clearly intended to result in State coverage of church-related schools, whose employees constitute over 80 percent of the employees of all nonprofit schools. In light of the repeal of 3309 (b)(3), we think the only services performed in the schools that may reasonably be considered within the scope of the exclusion permitted by 3309 (b)(1) are those strictly church duties performed by church employees pursuant to their religious responsibilities within the schools." Letter dated April 18, 1978, of Secretary Marshall to the Most Reverend Thomas C. Kelley, O. P., General Secretary, United States Catholic Conference.

The Secretary also ruled that neither § 3309 (b)(1)(A) nor § 3309 (b)(1)(B) was applicable to church-run schools. He notified the States, and they took steps for the collection of unemployment taxes from church-related schools. See Employment and Training Administration, U. S. Department of Labor, Unemployment Insurance Program Letter No. 39–78 (May 30, 1978), reprinted in [1978 Transfer Binder] CCH Unemp. Ins. Rep. ¶ 21,522.

## II

Both St. Martin and the Academy are members of the Wisconsin Evangelical Lutheran Synod and, as such, are organizations exempt from federal income tax under 26 U. S. C. § 501 (c)(3). St. Martin operates a state-certified elementary Christian day school at Watertown that offers kindergarten through eighth-grade education. The school, which is not a separate legal entity from the church, is controlled by a Board of Education elected from the local congregation. The congregation entirely finances the school's operation. The Academy is a state-certified 4-year secondary school at Mobridge and is owned, supported, and controlled by the

Synod. It, also, is not separately incorporated. Approximately half of its students go on to become ministers within the Church. According to the record, all courses given at St. Martin and at the Academy are taught from a religious point of view based on the Synod's scriptural convictions.

When South Dakota proposed to tax them under § 61–1–10.3, petitioners took an administrative appeal. The Appeals Referee of the State's Department of Labor—Unemployment Insurance Division ruled that service performed by employees of each petitioner was "employment" within the meaning of the statute. Although finding that the Synod "believes a theological basis exists for their schools" and operates them because it "holds the conviction that training of the youth involves both education and religion and that the two are so closely interwoven they cannot be separated," App. to Pet. for Cert. A–36, the Referee declined to rule that petitioners were exempt under § 61–1–10.4, the state analogue to 26 U. S. C. § 3309 (b). See nn. 1 and 2, *supra*. He ruled that petitioners were not eligible for exemption under § 61–1–10.4 (1)(a) because, in his view, the term "church," as used in that section, referred only to the "individual 'house of worship' maintained by a particular congregation." App. to Pet. for Cert. A–43. He also ruled, *ibid.*, that they were ineligible for exemption under § 61–1–10.4 (1)(b) because "the primary purpose of the schools is education."

On appeal, the Hughes County Circuit Court reversed, finding the Referee's decision clearly erroneous. App. to Pet. for Cert. A–25. The court ruled that both St. Martin and the Academy were exempt under § 61–1–10.4 (1)(b); that the term "church" referred to "an organization of worshippers," rather than to a "house of worship"; and that the primary purpose of the schools was the propagation of the Synod's faith, a religious concern. App. to Pet. for Cert. A–30 to A–33. The South Dakota Supreme Court, by a divided vote, in turn reversed the judgment of the Circuit Court, and held petitioners subject to the unemployment

compensation taxes.[9]  *In re Northwestern Lutheran Academy,* 290 N. W. 2d 845 (1980).  Noting the growing number of conflicting federal and state decisions on this issue,[10] we granted certiorari.  449 U. S. 950 (1980).

## III

A statute, of course, is to be construed, if such a construction is fairly possible, to avoid raising doubts of its constitutionality.  *Crowell* v. *Benson,* 285 U. S. 22, 62 (1932); *Machinists* v. *Street,* 367 U. S. 740, 749–750 (1961); *United States* v. *Clark,* 445 U. S. 23, 27 (1980).  Accordingly, we turn first to the federal statute itself.  From our reading of the legislation and of its history, we conclude that the only reasonable construction of 26 U. S. C. § 3309 (b)(1) is one

[9] The South Dakota Supreme Court's analysis depended entirely on its understanding of the meaning of FUTA and the First Amendment, and did not rest on any independent and adequate state ground.  We therefore are at liberty to review this judgment, although, literally, it concerns the construction of a state statute.  While the South Dakota courts remain free to construe the State's own law differently, they deserve to be made aware of the proper and, here, significant interpretation of the intertwined federal law.  See, *e. g., Zacchini* v. *Scripps-Howard Broadcasting Co.,* 433 U. S. 562, 566–568 (1977); *United Air Lines, Inc.* v. *Mahin,* 410 U. S. 623, 630–631 (1973); *State Tax Comm'n* v. *Van Cott,* 306 U. S. 511, 514–515 (1939).

[10] Most other courts that have addressed this general issue have ruled in favor of church-related schools.  See, *e. g., Alabama* v. *Marshall,* 626 F. 2d 366 (CA5 1980), cert. pending No. 80–922; *Lutheran Church-Missouri Synod* v. *Bowling,* 89 Ill. App. 3d 100, 411 N. E. 2d 526 (1980); *Roman Catholic Church of the Archdiocese of New Orleans* v. *State,* 387 So. 2d 1248 (La. App. 1980); *Sant Bani Ashram, Inc.* v. *New Hampshire Department of Employment Security,* 121 N. H. 74, 426 A. 2d 34 (1981); *Begley* v. *Employment Security Comm'n,* 50 N. C. App. 432, 274 S. E. 2d 370 (1981); *Grace Lutheran Church* v. *North Dakota Employment Security Bureau,* 294 N. W. 2d 767 (N. D. 1980); *Employment Division* v. *Archdiocese of Portland,* 42 Ore. App. 421, 600 P. 2d 926 (1979); *Christian School Assn.* v. *Commonwealth,* 55 Pa. Commw. 555, 423 A. 2d 1340 (1980).  But see *Ascension Lutheran Church* v. *Employment Security Comm'n,* 501 F. Supp. 843 (WDNC 1980).

that exempts petitioners' church-run schools, and others similarly operated, from mandatory state coverage.

## A

Section 3309 was added to FUTA in 1970. Although the legislative history directly discussing the intended coverage of its subsection (b)(1) is limited,[11] the House Report had the following explanation:

"This paragraph excludes services of persons where the employer is a church or convention or association of churches, but does not exclude certain services performed for an organization which may be religious in orientation unless it is operated primarily for religious purposes and is operated, supervised, controlled, or principally supported by a church (or convention or association of churches). Thus, the services of the janitor of a church would be excluded, but services of a janitor for a separately incorporated college, although it may be church related, would be covered. A college devoted primarily to preparing students for the ministry would be exempt, as would a novitiate or a house of study training candidates to become members of religious orders. On the other hand, a church related (separately incorporated) charitable organization (such as, for example, an orphanage or a home for the aged) would not be considered under this paragraph to be operated primarily for religious purposes." H. R. Rep. No. 91–612, p. 44 (1969).

---

[11] On the Senate floor, Senator Long, introducing the bill that became the 1970 Amendments, merely explained:

"The bill does not require extension of coverage to all jobs in nonprofit organizations. . . . [C]overage would not have to be extended to the employees of a church or religious organization, to clergymen or members of religious orders, [or] to elementary and secondary schools . . . ." 116 Cong. Rec. 10575 (1970).

Subsection (b)(1) was not specifically mentioned in the debates.

782

The Senate Report contained identical language. See S. Rep. No. 91–752, pp. 48–49 (1970).

Respondent would read this discussion, as the South Dakota Supreme Court majority did, to mean that Congress in 1970 intended to bring within mandatory state coverage all institutions of higher education, including those with no separate legal existence from the church or churches that operate them, except for the narrow category of seminaries and novitiates. From this, respondent extrapolates that Congress intended § 3309 (b)(1) to be read very narrowly, and that the later 94th Congress, in 1976, similarly intended to include within mandatory state coverage all primary and secondary educational institutions, including those entirely within the internal structure of churches.

The above quotation from the 1969 House Report, and its Senate counterpart, however, are susceptible of a simpler and more reasonable explanation that corresponds directly with the language of the subsection. Congress drew a distinction between employees "of a church or convention or association of churches," § 3309 (b)(1)(A), on the one hand, and employees of "separately incorporated" organizations, on the other. See H. R. Rep. No. 91–612, at 44. The former uniformly would be excluded from coverage by § 3309 (b)(1)(A), while the latter would be eligible for exclusion under § 3309 (b)(1)(B) only when the organization is "operated, supervised, controlled, or principally supported by a church or convention or association of churches." [12] To hold, as re-

---

[12] The importance of this distinction, and of giving meaning to both (A) and (B), is heightened by the great diversity in church structure and organization among religious groups in this country. See 1 A. Stokes, Church and State in the United States 720–883 (1950); Whelan, "Church" in the Internal Revenue Code: the Definitional Problems, 45 Ford. L. Rev. 885 (1977). This diversity makes it impossible, as Congress perceived, to lay down a single rule to govern all church-related organizations. Our holding today concerns only schools that have no legal identity separate from a church. To establish exemption from FUTA, a separately

spondent would have us do, that "organization" in subsection (b)(1)(B) also includes a church school that is not separately incorporated would make (b)(1)(A) and (b)(1)(B) redundant.

The distinction between church schools integrated into a church's structure, and those separately incorporated, is given further credence by the statute's use of specific words. The Department of Labor would interpret the term "church" in § 3309 (b)(1) as limited to the actual house of worship used by a congregation. See Brief for United States as *Amicus Curiae* 14–15.[13] This reading, however, appears to us to deny several of FUTA's phrases their intended meaning. Section 3309 (b), exempting "service performed—(1) in the employ of (A) a church . . . ," is phrased entirely in terms of the nature of the *employer,* and not in terms of the work performed or the place at which the employee works. Congress further defined "employer" in § 3306 (a) as "any *person who*—. . . paid wages . . . or . . . employed at least one individual" (emphasis added). It defined "employee" as "any individual who, under the usual common law rules applicable in

incorporated church school (or other organization) must satisfy the requirements of § 3309 (b)(1)(B): (1) that the organization "is operated primarily for religious purposes," and (2) that it is "operated, supervised, controlled, or principally supported by a church or convention or association of churches."

Because we hold petitioners exempt under § 3309 (b)(1)(A), we leave the issue of coverage under § 3309 (b)(1)(B) for the future.

[13] The United States strongly urges this construction, noting that the Department of Labor consistently has advanced this meaning of "church" since the 1970 enactment. See U. S. Department of Labor, Draft Legislation to Implement the Employment Security Amendments of 1970, pp. 27–28. The amount of deference due an administrative agency's interpretation of a statute, however, "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." *Skidmore* v. *Swift & Co.,* 323 U. S. 134, 140 (1944). Carefully considering the merits of the Secretary's interpretation, we believe it does not warrant deference.

determining the employer-employee relationship, has the status of an employee." §§ 3306 (i) and 3121 (d)(2). Thus, to hold "church" synonymous solely with a physical building that is a house of worship contradicts the phrasing of the statute.[14] The word "church" in § 3309 (b) must be construed, instead, to refer to the congregation or the hierarchy itself, that is, the church authorities who conduct the business of hiring, discharging, and directing church employees.[15]

We conclude that, at the time of its enactment in 1970, § 3309 (b)(1)(A) was meant to apply to schools, like petitioners', that have no separate legal existence from a church, or, as in the Academy's case, from a "convention or association of churches." As the Referee found, St. Martin directly finances, supervises, and controls its school's operations. The Synod similarly supports and controls the Academy. Only teachers trained and certified by the Synod may teach at either school, and, again as the Referee found, these teachers, both male and female, "receive a divine, life-long call" to the church. App. to Pet. for Cert. A–38. Male teachers ("teaching ministers") have equal status in the church and an equal vote on Synod matters, including matters of doctrine, with preaching ministers. *Id.*, at A–37. Neither school has a separate legal existence. Thus, the employees

---

[14] Congress knew how to limit expressly an exemption to the place of employment or the type of work performed. See § 3309 (b)(3) ("if such service is performed by an individual in the exercise of his duties"); § 3309 (b)(4) (service performed "in a facility"); § 3309 (b)(5) (service performed "as part of an unemployment work-relief or work-training program").

[15] Although we hold today that the word "church" in § 3309 (b) must be considered as the "employer," and not as a building that is a house of worship, we disavow any intimations in this case defining or limiting what constitutes a church under FUTA or under any other provision of the Internal Revenue Code. Cf. *Riker* v. *Commissioner,* 244 F. 2d 220 (CA9), cert. denied, 355 U. S. 839 (1957); *Chapman* v. *Commissioner,* 48 T. C. 358 (1967); *American Guidance Foundation, Inc.* v. *United States,* 490 F. Supp. 304 (DC 1980); *De La Salle Institute* v. *United States,* 195 F. Supp. 891 (ND Cal. 1961).

working within these schools plainly are "in the employ . . . of a church or convention or association of churches . . . ."[16] § 3309 (b)(1)(A).

## B

The 1976 Amendments did not alter the scope of § 3309 (b) (1), either directly or by implication.[17]  Congress, in eliminating the old § 3309 (b)(3), made no change in § 3309 (b) (1).  It did not discuss churches or church schools, and it intimated that § 3309 (b)(1) remained unchanged.  See, e. g., H. R. Rep. No. 94–755, pp. 23, 41, 55–56 (1975) (explaining the then-current coverage of § 3309 (b) and the anticipated effect of the repeal, and containing no indication that the proposed amendments would alter § 3309 (b)(1)).

---

[16] That church schools like those of the petitioners were eligible in 1970 for multiple exemptions under overlapping and equally precise parts of § 3309 is not remarkable.  This was true, for example, for most clergy. See §§ 3309 (b)(1) and 3309 (b)(2).  Clergy who teach in church-run primary or secondary schools continue to be exempt under two provisions. The deletion of only one of these clear, specific, and contemporaneous exemptions cannot, without evidence of legislative intent, effect repeal of the other or alter its plain meaning.  Cf. *HCSC-Laundry* v. *United States*, 450 U. S. 1 (1981) (newly enacted, more precise exemption held to prevail over earlier, more general exemption on the basis of detailed evidence of legislative intent).

[17] The United States argues that Congress must have intended, by the 1976 Amendments, to include church-related school employees within mandatory state coverage because the 1976 Amendments were passed, in part, to replace the temporary Special Unemployment Assistance program (established under the Emergency Jobs and Unemployment Assistance Act of 1974, 88 Stat. 1845), which provided benefits to practically all workers not then covered under the permanent FUTA provisions, including employees of church schools.  Brief for United States as *Amicus Curiae* 8–10. That special program, however, was funded entirely with federal money, without any employer contribution, and the 1976 Amendments did not attempt entirely to duplicate its coverage; indeed, those Amendments established new, precise exemptions for a narrow group.  See 26 U. S. C. § 3309 (b)(3) (the new provision exempting certain government employees); 122 Cong. Rec. 33274–33276 (1976) (remarks of Sen. Nelson); *id.*, at 33277–33278 (remarks of Sen. Williams).

Respondent places particular emphasis on legislative statements expressing an intention, for example, to extend coverage "on the basis of services performed for all educational institutions," H. R. Rep. No. 94–755, at 56,[18] and to "employees of non-profit elementary and secondary schools," *id.*, at 2. See also *id.*, at 41 ("This section requires States, as a condition for tax offset credit to their employers, to extend coverage to employees of non-profit primary and secondary institutions of education, thus broadening present required coverage limited to non-profit institutions of higher education"); S. Rep. No. 94–1265, pp. 2, 9–10 (1976).

These references are simply too general and too ambiguous to bear the weight respondent would assign to them.[19]   There is no indication that Congress, in these references, had in mind the scope of § 3309 (b)(1) and religious organizations. Rather, all the evidence demonstrates that it was concerned solely with the then-existing § 3309 (b)(3) and secular educational institutions, particularly the public schools.   Furthermore, the reported comments implying total coverage of all educational institutions, as a result of the repeal of the former § 3309 (b)(3), could not be taken as literally true because the 1970 Report expressly had noted that a college

---

[18] This comment reads in full:

"Section 115 (b) also has the effect of requiring the State to pay unemployment compensation on the basis of services performed for all educational institutions.   Under existing law, the State is only required to provide coverage of services performed for institutions of higher education."

[19] The United States also relies on Congress' expressed intention to cover "substantially all of the nation's wage and salary earners," H. R. Rep. No. 94–755, at 1, and "to provide equal treatment of all the nation's wage and salary workers under the permanent unemployment compensation law." *Id.*, at 2.   Such general statements of overall purpose contained in legislative reports cannot defeat the specific and clear wording of a statute. *Helvering* v. *City Bank Co.*, 296 U. S. 85, 89 (1935); *Caminetti* v. *United States*, 242 U. S. 470, 490 (1917).   Cf. *Gooch* v. *United States*, 297 U. S. 124, 128 (1936).

"devoted primarily to preparing students for the ministry," H. R. Rep. No. 91–612, at 44, would be exempt. All institutions of higher education had *not* been covered by the 1970 Amendments.

Respondent also relies on a single statistic estimating the number of employees newly to be covered as a result of the repeal of the then § 3309 (b)(3). See S. Rep. No. 94–1265, at 8 (table). This statistical reference, to the effect that 242,000 employees of nonprofit organizations would be covered by the 1976 repeal of subsection (b)(3), is much too meager to sustain respondent's position. The Committee Report's table containing this figure is devoid of any explanation, source, or supporting data. The South Dakota Supreme Court relied on the figure, however, reasoning that because it "approximates the total number of teachers in all nonprofit elementary and secondary schools" in 1975,[20] 290 N. W. 2d, at 849, and n. 5, Congress must have included within that number religious-school teachers, who constitute more than half the staff of all private elementary and secondary schools in the United States. Yet, in repealing § 3309 (b)(3), Congress intended to include not just full-time teachers, but all *employees* of the newly covered nonprofit private elementary and secondary schools (custodians, cafeteria workers, nurses, part-time help, counselors, etc.). Thus, the inclusion of all employees in nonprofit private lower schools within the number of persons brought within FUTA by the repeal would far exceed the 242,000 contained in the Report's table, rendering it, in our view, of dubious significance for the present issue.

This legislative history does not reveal any clear intent to repeal § 3309 (b)(1) or to alter its meaning. The Court has

---

[20] The court noted that census figures for 1975 showed 261,000 full-time teachers in nonprofit elementary and secondary schools, of which 150,000 were in Roman Catholic schools. Cf. Bureau of the Census, Statistical Abstract of the United States 155 (1980) (reporting that in 1976 there were 268,908 teachers in such schools and that, of these, 206,577 were in schools with a "church affiliation").

had frequent occasion to note that such indefinite congressional expressions cannot negate plain statutory language and cannot work a repeal or amendment by implication. "In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Morton* v. *Mancari,* 417 U. S. 535, 550 (1974); see also *Watt* v. *Alaska, ante,* p. 259; *TVA* v. *Hill,* 437 U. S. 153, 189–190 (1978); *FTC* v. *A. P. W. Paper Co.,* 328 U. S. 193, 202–203 (1946); *Posadas* v. *National City Bank,* 296 U. S. 497, 503–505 (1936); *United States* v. *Noce,* 268 U. S. 613, 618–619 (1925); *United States* v. *Greathouse,* 166 U. S. 601, 605 (1897). This long-established canon of construction carries special weight when an implied repeal or amendment might raise constitutional questions. See *NLRB* v. *Catholic Bishop of Chicago,* 440 U. S. 490 (1979). We therefore hold that the repeal of § 3309 (b)(3) did not alter the meaning of § 3309 (b)(1). Petitioners are eligible for exemption under subsection (b)(1)(A) by virtue of the nature of their relationship to the church bodies that employ them.

This makes it unnecessary for us to consider the First Amendment issues raised by petitioners.

The judgment of the Supreme Court of South Dakota is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, concurring in the judgment.

The legislative history of the Unemployment Compensation Amendments of 1976, 90 Stat. 2667, persuades me that Congress did intend the repeal of 26 U. S. C. § 3309 (b)(3) to remove the exemption from coverage under the Federal Unemployment Tax Act (FUTA) for all employees of private, nonprofit elementary and secondary schools. Not only do the Senate and House Committee Reports expressly so

state,[1] but also the estimate contained in the Senate Report of the number of additional employees that would be covered by the FUTA as a result of the repeal of § 3309 (b)(3) confirms the contemporaneous understanding of the draftsmen of the 1976 Amendments.[2]  Nothing in the 1976 Amendments

---

[1] The House Report states:

"Section 115 (b) also has the effect of requiring the State to pay unemployment compensation on the basis of services performed for all educational institutions.  Under existing law, the State is only required to provide coverage of services performed for institutions of higher education."  H. R. Rep. No. 94–755, p. 56 (1975).

See also id., at 2, 6, 41.  Similarly, the Senate Report provides:

"The bill would require the States to extend the coverage of their unemployment compensation programs to employees of nonprofit elementary and secondary schools (present law requires coverage for employees of institutions of higher education)."  S. Rep. No. 94–1265, p. 2 (1976).

See also id., at 7, 9–11.

In addition, the legislative history contains several references to the general congressional intention to extend the coverage of the FUTA to substantially all of the Nation's wage earners.  See, e. g., H. R. Rep. No. 94–755, supra, at 1–2; 122 Cong. Rec. 22518–22519 (1976); id., at 22899–22900.  While such general statements of legislative purpose cannot override plain statutory language, see ante, at 786, n. 19, they are nonetheless consistent with the more specific statements of purpose quoted above.

[2] The Senate Report estimated that 242,000 additional employees of nonprofit organizations would be covered under the FUTA as a result of the repeal of § 3309 (b)(3).  See S. Rep. No. 94–1265, supra, at 8.  This figure approximated the number of full-time teachers in all private, nonprofit elementary and secondary schools in 1975.  See ante, at 787, n. 20.  Because well over one-half of these teachers were employed in parochial schools, respondent argues that this statistic, although perhaps slightly inaccurate, indicates that Congress intended to extend coverage to employees of parochial elementary and secondary schools.  As the Court notes, the South Dakota Supreme Court accepted this argument.  See ante, at 787; 290 N. W. 2d 845, 849, and n. 5 (1980).

The Court finds that respondent's reliance upon this statistic is misplaced because, "in repealing § 3309 (b)(3), Congress intended to include not just full-time teachers, but all employees of the newly covered nonprofit private elementary and secondary schools."  Ante, at 787 (emphasis in original).  The Court's observation, however, indicates only that the

or the corresponding legislative history suggests that Congress believed the extension of FUTA coverage to nonprofit, private schools applied only to nonprofit, private, *nonparochial* schools.[3]

Despite this legislative history, I agree with the Court's conclusion that FUTA coverage does not extend to persons employed in petitioners' schools. Although Congress' intention to cover such employees was, in my judgment, clear, the 1976 Amendments simply failed to give effect to that intention. By repealing § 3309 (b)(3), Congress removed only one of the two statutory exemptions that, by their terms, applied to employees of parochial elementary and secondary schools. Congress left in place and did not qualify the scope of the separate exemption granted by § 3309 (b)(1). The clear expressions of congressional intent that appear in the legislative history of the Act that repealed § 3309 (b)(3)

statistic was factually inaccurate; it does not undercut respondent's reliance upon that statistic as a guide to congressional intent. Whether Congress believed that the figure 242,000 was an estimate of the number of additional teachers that would be covered by the Act as a result of the repeal of § 3309 (b)(3), or an estimate of the number of additional employees that would be so covered, the estimate would have had meaning only if at least some parochial school employees were represented among the 242,000 newly covered individuals.

It also should be noted that the Secretary of Labor, in his order declining to certify the unemployment compensation programs of the States of Alabama and Nevada under the FUTA, stated that the statistic had been supplied to Congress by the Department of Labor as the then-available best estimate of the total number of employees in all nonprofit, private elementary and secondary schools. See 44 Fed. Reg. 64378, 64380–64382, and n. 16 (1979). The Secretary also expressly stated that the estimate included employees of church-related elementary and secondary schools. See *ibid.*

[3] In light of the fact that approximately 86% of the students, see Rice, Conscientious Objection to Public Education: The Grievance and the Remedies, 1978 B. Y. U. L. Rev. 847, and over 50% of the teachers in private, nonprofit elementary and secondary schools are in parochial schools, Congress' failure to mention any exception for such schools is surely significant.

cannot alter the clear statutory language of § 3309 (b)(1). I agree with the Court that these church employees are exempt under the plain language of that provision. See also *Alabama* v. *Marshall,* 626 F. 2d 366 (CA5 1980), cert. pending, No. 80–922.

When the Court is confronted with the task of construing legislation of this character, there is special force to the rule that the plain statutory language should control and that resort to legislative history is appropriate only when the statute itself is ambiguous. Congress has a special duty to choose its words carefully when it is drafting technical and complex laws; we facilitate our work as well as that of Congress when we adhere closely to the statutory text in cases like this.[4] Failure to follow that approach led this Court into what I regard as manifest error in its recent summary, *per curiam* affirmance in *HCSC-Laundry* v. *United States,* 450 U. S. 1, a case in which the taxpayer's claim for exemption had equally strong support in the statutory text and, in my opinion, greater support in the legislative history than is true here. See *id.,* at 19–23 (STEVENS, J., dissenting). Today, although I agree that the Court reaches the result required by the text of the FUTA, I write this separate statement to emphasize that this result is not supported by the legislative history of the 1976 Amendments, nor is it consistent with the Court's contrary resolution of the parallel tax exemption issue in *HCSC-Laundry.*

Accordingly, I concur in the Court's judgment.

---

[4] The Court of Appeals in *Alabama* v. *Marshall* accurately characterized the judicial function in cases such as this:

"If Congress desires to change the established exemption of unemployment compensation coverage for elementary and secondary parochial school employees, it is well within its ability to amend the law to reflect that desire by drafting a clear statement to that effect. But, it is not the responsibility or function of this court to perform linguistic gymnastics in order to upset the plain language of Congress as it exists today." 626 F. 2d, at 369.