EMPLOYMENT SECURITY ADMINISTRATION,
DEPARTMENT OF HUMAN RESOURCES *v.*
BALTIMORE LUTHERAN HIGH SCHOOL
ASSOCIATION, INC. ET AL.

[No. 80, September Term, 1980.]

*Decided November 6, 1981.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Lois F. Lapidus, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Joel J. Rabin, Assistant Attorney General,* on the brief, for appellant.

*Paul J. Redmond* for appellee/cross-appellant Baltimore Lutheran High School Association, Inc. *James N. Phillips, Special Attorney,* with whom were *Leonard J. Grossman Paul F. Interdonato* on the brief, for appellees, Board of Appeals, Employment Security Administration, Beth Tfiloh, Congregation and Archdiocese of Washington.

DAVIDSON, J., delivered the opinion of the Court.

A Jewish synagogue, Beth Tfiloh, operates a day school (Jewish day school) which is not separately incorporated. Another Jewish synagogue, Liberty Jewish Center (Jewish Sunday school), operates a Sunday school which is not separately incorporated. Various Roman Catholic churches within the Archdiocese of Washington (Archdiocese) operate 52 parochial schools (Catholic

parochial schools) which are not separately incorporated. Various Roman Catholic religious orders within the Archdiocese, each of which is separately incorporated, operate 12 private schools (Catholic private schools). There is no evidence to show whether any of these Catholic private schools are separately incorporated. The Baltimore Lutheran High School Association, Inc. (Lutheran Association) is composed of Lutheran churches, each of which is a member of the Lutheran Church — Missouri Synod. The Lutheran Association is separately incorporated and operates the Baltimore Lutheran High School (Lutheran High).

This case presents the question whether each of these schools is entitled to an exemption for its school employees from taxes imposed by the Federal Unemployment Tax Act (FUTA), 26 U.S.C. §§ 3301-3311 (1976 & Supp. III 1979), and by Maryland's complementary statute, Md. Code (1957, 1979 Repl.Vol. & 1981 Cum.Supp.), Art. 95A, §§ 1-23, the Unemployment Insurance Law. The provisions primarily at issue are FUTA's § 3309 (b) and Maryland's Art. 95A, § 20 (g) (7) (v) (B).

Title 26 U.S.C. § 3309 (b), effective 10 August 1970, provides in pertinent part:

> "This section shall not apply to services performed —
>
> "(1) in the employ of (A) a church or convention or association of churches, or (B) an organization which is operated primarily for religious purposes and which is operated, supervised, controlled, or principally supported by a church or convention or association of churches;
>
> "(2) by a duly ordained, commissioned, or licensed minister of a church in the exercise of his ministry or by a member of a religious order in the exercise of duties required by such order. . . ."

Maryland Code, Art. 95A, § 20 (g) (7) (v) (B), effective 1 July 1978, provides:

" 'Employment' does not include:

. . .

"B. Service by an individual in the employ of a church or convention or association of churches, or an organization which is operated primarily for religious purposes and which is operated, supervised, controlled, or principally supported by a church or convention or association of churches."

Each of the schools claims an exemption on both statutory and First Amendment grounds.[1]

The Employment Security Administration's Board of Appeals (Board) in Appeal No. 243524 held that the Jewish day and Sunday schools were operated primarily for religious purposes and, therefore, were entitled to an exemption. In Decision No. 55-EA-79, the Board held that the Catholic parochial schools and the Catholic private schools were also operated primarily for religious purposes and were entitled to an exemption. In Decision No. 39-EA-79, the Board held that Lutheran High was not operated primarily for religious purposes and was not entitled to an exemption.

In the Superior Court of Baltimore City, the decisions of the Board were affirmed. In addition, the trial court determined that, in light of its conclusion that the Jewish day and Sunday schools, the Catholic parochial schools, and the Catholic private schools were entitled to an exemption, it need not consider the constitutional issues raised with respect to those schools. However, it held that the imposition of a tax on Lutheran High did not violate the First Amendment.

Both the Employment Security Administration and the Lutheran Association filed appeals to the Court of Special Appeals from the trial court's judgment. While that appeal was pending, the Employment Security Administration filed

---

1. U.S. Const. amend. I provides in pertinent part:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ."

a petition for a writ of certiorari. We issued a writ of certiorari to the Court of Special Appeals before consideration by that Court. We shall affirm that portion of the trial court's judgment affirming the Board's decision in Appeal No. 243524 and Decision No. 55-EA-79 that the Jewish day and Sunday schools and the Catholic parochial schools are entitled to an exemption. We shall vacate that portion of the trial court's judgment affirming the Board's decision in Decision No. 39-EA-79 that Lutheran High is not entitled to an exemption. Finally, we shall vacate that portion of the trial court's judgment affirming the Board's decision in Decision No. 55-EA-79 that the Catholic private schools are entitled to an exemption. We will remand the case to the Board without affirmance or reversal for further proceedings in accordance with this opinion.[2]

On 26 May 1981, the United States Supreme Court decided *St. Martin Evangelical Lutheran Church v. South Dakota,* 451 U.S. 772, 101 S.Ct. 2142 (1981). There, members of the Wisconsin Evangelical Lutheran Synod operated two schools, St. Martin Evangelical Lutheran Church School (St. Martin) and Northwestern Lutheran Academy (Academy). These two institutions were described by the Court as follows:

> "St. Martin operates a state-certified elementary Christian day school at Watertown that offers kindergarten through eighth-grade education. The school, which is not a separate legal entity from the church, is controlled by a Board of Education elected from the local congregation. The

---

2. In light of our decision that the Jewish day and Sunday schools and the Catholic parochial schools are entitled to an exemption, and in the absence of a decision whether Lutheran High and the Catholic private schools are entitled to an exemption, we need not determine the constitutional issues raised. Ordinarily, courts do not pass upon a constitutional question, although properly presented by the record, if there is also present some other ground upon which to dispose of the case, and do not decide questions of a constitutional nature unless absolutely necessary to a decision of the case. Elkins v. Moreno, 435 U.S. 647, 660-61, 98 S.Ct. 1338, 1346-47 (1978); Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 346-48, 56 S.Ct. 466, 482-83 (1936); Scott v. State, 289 Md. 647, 651, 426 A.2d 923, 926 (1981); State v. Insley, 64 Md. 28, 30-31, 20 A. 1031, 1031 (1885).

congregation entirely finances the school's operation. The Academy is a state-certified 4-year secondary school at Mobridge and is owned, supported, and controlled by the Synod. It, also, is not separately incorporated. Approximately half of its students go on to become ministers within the Church. According to the record, all courses given at St. Martin and at the Academy are taught from a religious point of view based on the Synod's scriptural convictions." *St. Martin,* 451 U.S. at 778-79, 101 S.Ct. at 2146.

The question presented was whether schools operated by a church or an association of churches that were not separately incorporated and, therefore, had no separate legal existence from the church or association of churches were entitled to an exemption for their school employees from taxes imposed by FUTA's § 3309 (b) and South Dakota's complementary statute.[3] There, as here, the exemption was claimed on both statutory and First Amendment grounds.

In reaching its decision, the Supreme Court reviewed the legislative history and language of § 3309 (b) (1). It concluded that

"at the time of its enactment in 1970, § 3309 (b) (1) (A) was meant to apply to schools, like petitioners', *that have no separate legal existence from a church,* or, as in the Academy's case, from a 'convention or association of churches.' " *St. Martin,* 451 U.S. at 784, 101 S.Ct. at 2149 (emphasis added).

It held that § 3309 (b) (1) (A) "exempts petitioners' church-run schools, and others similarly operated, from mandatory state coverage." *St. Martin,* 451 U.S. at 780-81, 101 S.Ct. at 2147.

The Supreme Court made it clear, however, that it was not deciding whether a separately incorporated church-

---

3. S.D. Comp. Laws Ann. § 61-1-1 et seq. (1978 Rev.2d 1980 Supp.).

affiliated school would be exempt under § 3309 (b) (1) (B). It said:

> "Our holding today concerns only schools that have no legal identity separate from a church. To establish exemption from FUTA, a separately incorporated church school (or other organization) must satisfy the requirements of § 3309 (b) (1) (B): (1) that the organization 'is operated primarily for religious purposes', and (2) that it is 'operated, supervised, controlled, or principally supported by a church or convention or association of churches.'" *St. Martin,* 451 U.S. at 782-83 n.12, 101 S.Ct at 2148 n.12.

## I

### The Jewish Day and Sunday Schools and the Catholic Parochial Schools

The Supreme Court's decision that schools having no legal identity separate from a church are exempt is dispositive of the claims respecting the Jewish day and Sunday schools and the Catholic parochial schools, none of which are separately incorporated. These institutions satisfy the requirements of § 3309 (b) (1) (A) and are entitled to an exemption for their school employees. Accordingly we shall affirm that portion of the trial court's judgment affirming the Board's decision in Appeal No. 243524 and Decision No. 55-EA-79 that the Jewish day and Sunday schools and the Catholic parochial schools are entitled to an exemption.

## II

### Lutheran High

The Supreme Court's decision in *St. Martin* is not dispositive of the claim of the Lutheran Association which is separately incorporated and operates Lutheran High. To establish an exemption, the Lutheran Association must

show that Lutheran High satisfies the requirements of § 3309 (b) (1) (B).

The initial question to be considered is whether Lutheran High "is operated primarily for religious purposes." In *St. Martin,* the Supreme Court did not apply the standard established in § 3309 (b) (1) (B) and, therefore, did not articulate the factors to be taken into account in determining whether a church-affiliated school is operated primarily for religious purposes. The Supreme Court, in applying similar standards in other contexts, has identified appropriate factors. *See, e.g., Meek v. Pittinger,* 421 U.S. 349, 363, 95 S.Ct. 1753, 1762 (1975) ("primary effect of advancing religion because of the predominantly religious character of the schools"); *Hunt v. McNair,* 413 U.S. 734, 743, 93 S.Ct. 2868, 2874 (1973) ("primary effect of advancing religion"); *Tilton v. Richardson,* 403 U.S. 672, 680, 91 S.Ct. 2091, 2097 (1971) ("religion so permeates the secular education . . . that their religious and secular educational functions are in fact inseparable"); *Lemon v. Kurtzman,* 403 U.S. 602, 616, 91 S.Ct. 2105, 2113 (1971) ("substantial religious activity and purpose"); *Board of Educ. of Cent. School Dist. No. 1 v. Allen,* 392 U.S. 236, 243, 88 S.Ct. 1923, 1926 (1968) ("primary effect that neither advances nor inhibits religion").

In *Roemer v. Board of Public Works of Maryland,* 426 U.S. 736, 739, 96 S.Ct. 2337, 2341 (1976), the Supreme Court considered the constitutionality, under the First Amendment, of a Maryland statute that provided for annual, noncategorical grants to private colleges, including religiously affiliated institutions, subject only to the restrictions that the funds not be used for "sectarian purposes." In reaching its conclusion that the statute was constitutional on its face and as applied, the Supreme Court considered, among other things, whether four colleges, all Roman Catholic affiliates, were "pervasively sectarian." In reviewing the United States District Court for the District of Maryland's findings, the Supreme Court stated:

> "(a) Despite their formal affiliation with the Roman Catholic Church, the colleges are 'char-

acterized by a high degree of institutional autonomy.' None of the four receives funds from, or makes reports to, the Catholic Church. The Church is represented on their governing boards, but, as with Mount Saint Mary's, 'no instance of entry of Church considerations into college decisions was shown.'

"(b) The colleges employ Roman Catholic chaplains and hold Roman Catholic religious exercises on campus. Attendance at such is not required; the encouragement of spiritual development is only 'one secondary objective' of each college; and 'at none of these institutions does this encouragement go beyond providing the opportunities or occasions for religious experience.' It was the District Court's general finding that 'religious indoctrination is not a substantial purpose or activity of any of these defendants.'

"(c) Mandatory religion or theology courses are taught at each of the colleges, primarily by Roman Catholic clerics, but these only supplement a curriculum covering 'the spectrum of a liberal arts program.' Nontheology courses are taught in an 'atmosphere of intellectual freedom' and without 'religious pressures.' Each college subscribes to, and abides by, the 1940 Statement of Principles on Academic Freedom of the American Association of University Professors.

"(d) Some classes are begun with prayer. The percentage of classes in which this is done varies with the college, from a 'minuscule' percentage at Loyola and Mount Saint Mary's, to a majority at Saint Joseph. There is no 'actual college policy' of encouraging the practice. 'It is treated as a facet of the instructor's academic freedom.' Classroom prayers were therefore regarded by the District Court as 'peripheral to the subject of religious permeation,' as were the facts that some instructors

wear clerical garb and some classrooms have religious symbols. The court concluded:

> 'None of these facts impairs the clear and convincing evidence that courses at each defendant are taught "according to the academic requirements intrinsic to the subject matter and the individual teacher's concept of professional standards." [citing *Tilton v. Richardson,* 403 U.S., at 681].'
>
> . . .
>
> "(e) The District Court found that, apart from the theology departments, faculty hiring decisions are not made on a religious basis. At two of the colleges, Notre Dame and Mount Saint Mary's, no inquiry at all is made into an applicant's religion. Religious preference is to be noted on Loyola's application form, but the purpose is to allow full appreciation of the applicant's background. Loyola also attempts to employ each year two members of a particular religious order which once staffed a college recently merged into Loyola. Budgetary considerations lead the colleges generally to favor members of religious orders, who often receive less than full salary. Still, the District Court found that 'academic quality' was the principal hiring criterion, and that any 'hiring bias,' or 'effort by any defendant to stack its faculty with members of a particular religious group,' would have been noticed by other faculty members, who had never been heard to complain.
>
> "(f) The great majority of students at each of the colleges are Roman Catholic, but the District Court concluded from a 'thorough analysis of the student admission and recruiting criteria' that the student bodies 'are chosen without regard to religion.'"
> *Roemer,* 426 U.S. at 755-58, 96 S.Ct. at 2349-50 (citations omitted) (footnote omitted).

The Supreme Court affirmed the District Court's finding that the four colleges were not "pervasively sectarian."

In *The Horace Mann League of the United States of America, Inc. v. Board of Public Works of Maryland,* 242 Md. 645, 672, 220 A.2d 51, 65-66, *cert. denied,* 385 U.S. 97, 87 S.Ct. 317 (1966), which preceded *Roemer,*[4] this Court considered similar factors in determining whether an educational institution is secular or sectarian. There, the question concerned the constitutionality, under the First Amendment and the Maryland Declaration of Rights, of a Maryland statute that provided state grants for the construction of buildings to church-affiliated private colleges. In reaching its conclusions, this Court said:

> "The experts on both sides are in general accord that the following factors are significant in determining whether an educational institution is religious or sectarian: (1) the stated purposes of the college; (2) the college personnel, which includes the governing board, the administrative officers, the faculty, and the student body (with considerable stress being laid on the substantiality of religious control over the governing board as a criterion of whether a college is sectarian); (3) the college's relationship with religious organizations and groups, which relationship includes the extent of ownership, financial assistance, the college's memberships and affiliations, religious purposes, and miscellaneous aspects of the college's relationship with its sponsoring church; (4) the place of religion in the college's program, which includes the extent of religious manifestation in the physical surroundings, the character and extent of religious observance sponsored or encouraged by the college, the required participation for any or all students, the extent to which the college sponsors or encourages religious activity of sects different from that of the college's own church and the place of religion in

---

4. Our reliance on the factors utilized in *Horace Mann* is not to be construed as indicating the continuing validity of the holding of that case in light of *Roemer.*

the curriculum and in extra-curricular programs; (5) the result or 'outcome' of the college program, such as accreditation and the nature and character of the activities of the alumni; and (6) the work and image of the college in the community." *The Horace Mann League,* 242 Md. at 672, 220 A.2d at 65-66.

All of the cases indicate that in determining whether church-affiliated schools are "operated primarily for religious purposes," certain factors may appropriately be taken into account, including:

1) Interrelationship between affiliation with the church and institutional autonomy.
   a) Composition of governing board.
   b) Degree of supervision by church.
   c) Sources of financial support.
2) Extent of religious indoctrination.
   a) Stated purpose.
   b) Extent of encouragement of spiritual development.
   c) Composition of student body.
   d) Extent of religious exercises.
   e) Extent of prayer in the classroom.
   f) Extent of religion or theology classes.
   g) Degree of intellectual freedom in nontheology classes.
   h) Composition of faculty.
   i) Degree of academic freedom.

We shall apply these factors here.

The record shows that the Lutheran Church — Missouri Synod (Synod) is composed of a group of congregations. The Lutheran Association is composed of 18 Lutheran congregations located within the Baltimore metropolitan area, each of which is a member of the Synod. Each congregation elects four delegates to serve as voting members of the Association. Each of the delegates must be a member of the congregation. One delegate may be the pastor

and one may be a Lutheran parochial school teacher. The voting members elect from among themselves a Board of Directors composed of 18 persons. Two of the directors must be pastors, at least one must be a Lutheran parochial school teacher, and the remainder must be lay members. Thus, every member of the Board of Directors is directly affiliated with the Lutheran Church.

The Board of Directors is empowered to conduct, manage, and administer all of the affairs of the Lutheran Association. However, while Lutheran High is allegedly "sovereign," the Board of Directors relies upon a Board of Parish Education located in St. Louis, Missouri, to coordinate its activities with other Lutheran secondary schools of the Synod throughout the country. More important, the Board of Directors consults with the Board of Parish Education which in turn makes recommendations concerning policy and the hiring of faculty at Lutheran High. Most important, Lutheran High must abide by the doctrine enunciated by the Synod and its failure to do so may result in its being "asked to withdraw" from the Synod. Thus, there is a significant degree of supervision by the church.

Lutheran High has three funding sources. Tuition payments account for approximately 80 percent of the school's operating budget. Approximately 60 percent of the student body are members of the Synod, approximately 10 percent are Lutheran but not members of the Synod, and 30 percent are not Lutheran. Tuition varies depending upon religious affiliation with members of the Synod paying a lesser fee. Gifts account for approximately 14 percent of the school's operating budget. The remaining six percent is provided by an assessment upon each member of the congregations comprising the Lutheran Association. Thus, a significant part of Lutheran High's operating budget is provided by members of the Synod.

The Lutheran Association's stated purpose, in accordance with its Articles of Incorporation, is:

> "To promote, establish, conduct and maintain one or more Lutheran High Schools in Baltimore and its

environs, in harmony with the teachings of the Bible and the principles and practices of the Lutheran Church."

According to its principal, Lutheran High's primary purpose is religious. He testified:

"The goal is simply to bring young people up in an atmosphere where the Gospel of Jesus Christ will be shared with them on a daily basis so that they may grow in faith and knowledge of the Lord Savior so that they might live their life in the praise and glory of God."

In addition, according to the principal, the encouragement of spiritual development is central to the educational process. He testified:

"It is understood from the moment that the child enters the classroom that this is a close structure and that we are Christians together learning, learning about God's Word and also about the subject area in which that particular class is meeting. But it's an opportunity for a Christian teacher to witness with his faith to young people. Each meeting between a teacher and a pupil is an opportunity for religious instruction and religious counseling meeting spiritual needs."

Heavy emphasis is placed upon the desire for a Christian education in the recruitment and admission of students. According to the principal, the student body is composed of persons

"accepted on the basis of the fact they and their parents desire to have a Christian education. By that we mean that they are willing and eager to be surrounded by the Word of God; that they are willing to have the Gospel shared with them on a daily basis and they are willing and eager to worship God in these surroundings, and that they will work together with the faculty in placing God in determining his will for them in their life."

Seventy percent of the student body is Lutheran.

The entire student body is required to attend weekly chapel services at which the students worship together with the faculty. Prayer is an integral part of the educational process. At the beginning of the day, each class starts with "devotions." Each day lunch is concluded with a prayer. According to the principal, classes are often interrupted to

> "pray for someone who's in need or for a student or a parent or just that the class can learn better. And it is something that is just a part of our regular life together there."

Each student is required to take four credit hours of religious training, consisting of attendance at one class in religion each day. Each student is also required to take 20 credit hours of nontheological subjects, consisting of six classes a day. While these classes are taught according to the standards established by the State Department of Education, they are also taught according to the standards established by the Synod. Indeed, according to the principal:

> "[Religion] is taught each day, each period. It is taught in a separate period but yet at the same time it is taught in every class that we have. . . . Every teacher that we have views his teaching as a ministry whereby his relationship with the students is one in which he is concerned about his spiritual welfare and that in the relationship of the subject area that is taught, the child m[a]y grow in the Word of God, knowledge of God and praise of God."

Heavy emphasis is placed upon religious training in the recruitment and selection of faculty. The faculty consists of 28 persons, all of whom have been trained in a Lutheran college or seminary and all of whom are required to be Christians. Twenty-one faculty members have been trained in a synodical school. Nineteen are installed ministers of religious education who have received a call to service by a congregation. They have been listed with the Internal Reve-

nue Service as duly ordained, commissioned or licensed ministers of a church in the exercise of their ministry. Only one faculty member is not Lutheran. Each faculty member is trained to teach all subjects from a Christian viewpoint and is required to abide by the doctrine enunciated by the Synod.

There was much evidence intended to show that religious indoctrination permeates the educational process within Lutheran High. However, there was no evidence to show the nature of the mandatory chapel services. There was no evidence to show whether the religion courses taught at the school were devoted to deepening religious experiences in the particular faith rather than teaching a range of human religious experiences as an academic discipline. In addition, while there was testimony that religion is taught in every nontheological course, and that each faculty member is trained to teach all subjects from a Christian viewpoint according to the doctrine enunciated by the Synod, no details were provided as to the impact of religion on the instructional methods employed and the substantive content presented. More particularly, no teacher presented any evidence to show how teaching a nontheological course from a Christian viewpoint and according to the standards established by the Synod, differed from teaching such a course according to the academic requirements of the subject matter and the standards established by the State Department of Education. Finally, there was no evidence to show whether the school subscribes to and follows the principles of academic freedom.

In reaching its determination that Lutheran High's primary purpose is educational, the Board stated:

> "In accordance with the Articles of Incorporation, and in its standard operation of its high school, the Petitioner is a separate entity and not part of a church. The primary purpose of the High School is education of its students and it meets all the educational requirements necessary for a High School diploma. The Petitioner requires that each student

who is enrolled in its high school have twenty credit hours of instruction in secular subjects, plus four credit hours of religious training for graduation. As a result of these requirements, the Petitioner's primary purpose is devoted to education."

However, in order to determine whether a school is operated primarily for educational rather than religious purposes, it is necessary to consider whether courses are taught in "an 'atmosphere of intellectual freedom' . . . 'without religious pressures,'" *Roemer,* 426 U.S. at 756, 96 S.Ct. at 2349, and according to the principles of academic freedom. In the absence of evidence to show the substantive content of both theological and nontheological courses, and the instructional methods employed in these courses, there is no basis upon which to make this determination. Manifestly, in reaching its conclusion, the Board did not take all of the appropriate factors into account.

Under the present circumstances, the purposes of justice will be advanced by permitting further proceedings in this case including the introduction of evidence before the Board and the application by the Board of the standard and the appropriate factors set forth in this opinion. Accordingly, we shall vacate that portion of the trial court's judgment affirming the Board's decision in Decision No. 39-EA-79 that Lutheran High is not entitled to an exemption and shall remand the case to the Board without affirmance or reversal for further proceedings in accordance with this opinion. Md. Rule 871.

### III

### Catholic Private Schools

The Supreme Court's decision in *St. Martin* is not dispositive of the claim of the Catholic private schools operated by religious orders within the Archdiocese. To establish an exemption, these schools must show that they satisfy both requirements of § 3309 (b) (1) (B).

Unfortunately, the record in this case is inadequate for the purpose of review. The record before the Board did not show that the Catholic private schools are operated by separately incorporated religious orders. In addition, the record did not show whether any of these schools are themselves separately incorporated. While there was some evidence presented to show general characteristics of a "typical" private school, no evidence was presented to show the particular characteristics of each individual school. On the basis of the record before it, the Board treated the Catholic private schools as "having the same status as parish operated schools" and held that these schools were entitled to an exemption.

After the Supreme Court's decision in *St. Martin,* counsel for the Archdiocese advised the Board that the Catholic private schools are operated by religious orders, each of which is separately incorporated. Counsel for the Board advised this Court that the Board accepted this fact which was inconsistent with its findings in Decision No. 55-EA-79. No indication was given as to whether any of the Catholic private schools are themselves separately incorporated.

In order to apply the standards articulated in *St. Martin,* it is necessary to have additional evidence. Under the circumstances here, the purposes of justice will be advanced by permitting further proceedings in this case, including the introduction of evidence before the Board and the application by the Board of the standard set forth in this opinion. Accordingly, we shall vacate that portion of the trial court's judgment, affirming the Board's decision in Decision No. 55-EA-79 that the Catholic private schools are entitled to an exemption, and shall remand the case to the Board without affirmance or reversal for further proceedings in accordance with this opinion. Md. Rule 871.

> *Judgment of the Superior Court of*
> *Baltimore City affirmed in part*
> *and vacated in part.*

*Case remanded to that court with directions to vacate the Board of Appeals' Decision No. 39-EA-79, and a portion of the Board of Appeals' Decision No. 55-EA-79, and to remand the case to that board for further proceedings in accordance with this opinion.*

*One-half of the costs to be paid by Employment Security Administration; one-half of the costs to abide the results.*