**Dorothy VERDECCHIA, Petitioner,**

v.

**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW, Respondent.**

**Lillie D. BERNABE, Petitioner**

v.

**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW, Respondent.**

**Lorraine PETRONELIS and Florence M. Peterson, Petitioners,**

v.

**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW, Respondent.**

Commonwealth Court of Pennsylvania.

Argued March 13, 1995.

Decided April 17, 1995.

Gary F. Lynch, for petitioners Dorothy A. Verdecchia and Lillie D. Bernabe.

Dan P. Wimer, for petitioners Lorraine Petronelis and Florence M. Peterson.

Maura K. Quinlan, for intervenor St. Joseph's Residence.

No appearance, for respondent.

Before COLINS, President Judge, and FRIEDMAN, J., and RODGERS, Senior Judge.

FRIEDMAN, Judge.

Dorothy A. Verdecchia, Lillie D. Bernabe, Lorraine Petronelis and Florence M. Peterson (collectively, Claimants) appeal from various orders of the Unemployment Compensation Board of Review (Board) affirming the referees' decisions to deny Claimants unemployment compensation benefits under section 4(*l*)(4)(8) of the Unemployment Compensation Law (Law), Act of December 5, 1936, Second Ex.Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 753(*l*)(4)(8).[1]

Claimants were employed by the Roman Catholic Diocese of Pittsburgh (the Diocese) at St. Joseph's Personal Care Residence (St. Joseph's) when the Diocese decided to close the facility.[2] Claimants each applied for unemployment compensation benefits at the lo-

---

1. Section 4(*l*)(4)(8)(a) of the Law, 43 P.S. § 753(*l*)(4)(8)(a), states in pertinent part that employment, for purposes of Articles X, XI and XIII, does not include:

   (a) Service performed in the employ of (i) a church or convention or association of churches or (ii) an organization which is operated primarily for religious purposes and which is operated, supervised, controlled or principally supported by a church or convention or association of churches. . . .

2. Verdecchia was employed as a nurse's aide; Petronelis and Peterson were personal care aides; and Bernabe was a cook.

cal job center, which denied their applications. Claimants appealed and separate hearings were held before referees.[3]

After the hearings on the appeals of Petronelis and Peterson, at which the Diocese did not appear, the referee issued decisions reversing the job center's determinations and awarding benefits. The Diocese appealed to the Board, which issued a Board Hearing Order remanding both cases for a second hearing before a referee who, acting as hearing officer for the Board, was to take additional testimony and evidence on the Diocese's reason for not appearing at the prior hearings and on the merits.[4]

At the remand hearing,[5] the Diocese testified that it failed to appear at the prior hearings because it never received notice. The Diocese stated that it notified the post office to forward mail for St. Joseph's to the Diocese; however, the post office held some of the mail for as long as six weeks before delivering it. Based on this testimony, the Board found that the Diocese had good cause for its non-appearance at the referee's hearings.

With respect to the merits, the Board found that the purpose of St. Joseph's was to minister to poor and elderly persons by providing them with personal care assistance. (Petronelis and Peterson, Board's Finding of Fact, No. 9.) The Board also found that Petronelis and Peterson were paid by the Diocese and were subject to its personnel policies and practices. (Petronelis and Peterson, Board's Finding of Fact, No. 12.) The Board reversed the referee's decisions, concluding that because the employment of Petronelis and Peterson falls within the purview of section 4($l$)(4)(8)(a) of the Law, Pe-

tronelis and Peterson are ineligible for benefits.

The Diocese appeared and testified at the referee's hearings on the appeals of Verdecchia and Bernabe. Based on that testimony, the referee found that St. Joseph's was operated and funded by the Diocese and that St. Joseph's provided personal care and religious services to residents of various religious denominations. (Verdecchia and Bernabe, Referee's Findings of Fact, Nos. 5–7.) The referee concluded that Verdecchia and Bernabe were ineligible for benefits under section 4($l$)(4)(8)(a)(ii) of the Law because the Diocese operated St. Joseph's primarily for religious purposes. Thus, the referee affirmed the job center's determinations. Verdecchia and Bernabe appealed to the Board, which affirmed the decisions of the referee.

■ On appeal to this court,[6] Petronelis and Peterson argue that the Diocese failed to show that it had good cause for its non-appearance at the referee's hearings; therefore, the decision of the referee to award benefits should prevail. In addition, Claimants argue that the Board erred in concluding that the Diocese operated St. Joseph's primarily for religious purposes so that subsection (ii) of section 4($l$)(4)(8)(a) of the Law applies here.

**I.**

■ First, Petronelis and Peterson argue that the Diocese failed to show that it had good cause for its non-appearance at the initial referee's hearings. We disagree.

Requests for an additional hearing by a party who did not attend a scheduled hearing

---

3. Hearings were held before Referee Frank Vivier on the appeals of Petronelis and Peterson. Hearings were held before Referee John R. Cross on the appeals of Verdecchia and Bernabe.

4. With respect to the merits, the Board sought information regarding the primary purpose of St. Joseph's and the source of its operation, supervision, control and principal support. The Board stated that it would not consider the additional testimony and evidence on the merits if the Diocese did not have good cause for its non-appearance at the referee's hearings.

5. The cases were consolidated for the remand hearing. (Hearing of December 6, 1993, N.T. at 1.)

6. Claimants' appeals have been consolidated by order of this court. Our scope of review is limited to determining whether the claimants' constitutional rights were violated, whether an error of law was committed or whether the necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704; *Steinberg Vision Associates v. Unemployment Compensation Board of Review*, 154 Pa.Commonwealth Ct. 486, 624 A.2d 237 (1993).

are governed by the Board's rule of procedure 101.24, which provides in pertinent part:

> (a) If a party who did not attend a scheduled hearing subsequently gives written notice, which is received by the tribunal prior to the release of a decision, and it is determined by the tribunal that his failure to attend the hearing was for reasons which constitute "proper cause," the case shall be reopened. *Requests for reopening, whether made to the referee or the Board, shall be in writing; shall give the reasons believed to constitute "proper cause" for not appearing; and they shall be delivered or mailed ... to the local employment office where the appeal was filed.*
>
> . . . .
>
> (c) *A request* for reopening the hearing which is not received before the decision was mailed, but is *received or postmarked on or before the 15th day after the decision of the referee was mailed to the parties shall constitute a request for further appeal to the Board and a reopening of the hearing,* and the Board will rule upon the request. . . .

34 Pa.Code § 101.24 (emphasis added); *see also McNeill v. Commonwealth, Unemployment Compensation Board of Review,* 510 Pa. 574, 511 A.2d 167 (1986).

The Diocese complied with the requirements of the Board's rule by mailing a written request to the local employment office on October 13, 1993, before the 15th day after the decision of the referee was mailed to the parties on October 1, 1993, stating that the Diocese failed to appear at the scheduled hearing because it did not receive notice of the date and time of the hearing. The Board granted the additional hearing but required additional testimony and evidence on the Diocese's claim that it did not receive notice. Based on testimony that the post office was negligent in delivering St. Joseph's mail to the Diocese, the Board determined that the Diocese had "proper cause" for non-appearance at the referee's hearings. Contrary to the contention of Petronelis and Peterson, this is not an error of law. *See Sanders v. Commonwealth, Unemployment Compensation Board of Review,* 105 Pa.Commonwealth Ct. 372, 524 A.2d 1031 (1987) (negligence of a disinterested third party may excuse dilatory actions of a party to the litigation).

## II.

Next, Claimants argue that the Board erred in concluding that the Diocese operated St. Joseph's primarily for religious purposes. In particular, Claimants contend that because the Diocese operated St. Joseph's primarily as a licensed nursing home,[7] subsection (ii) of section 4($l$)(4)(8)(a) of the Law does not apply here. We disagree.[8]

---

[7.] Claimants contend that the Diocese's decision to close the facility was solely for financial reasons. Claimants note, for example, that St. Joseph's was licensed to care for thirty-one individuals, but the Diocese was only able to fill thirteen beds. Although those thirteen residents each paid $900 per month for personal care, the total received was not sufficient to support the facility. For that reason, the Diocese had to contribute $220,000 to St. Joseph's to continue its operation, which the Diocese believed was excessive.

The Diocese, however, maintains that it decided to close St. Joseph's in order to be better stewards of the money which the Diocese budgeted for its ministry to the poor and elderly. The Diocese points out that St. Joseph's was never operated for profit and, indeed, based on figures contained in the record, the Diocese would not have realized a profit even if every bed at St. Joseph's had been filled. With thirteen of thirty-one beds filled, the Diocese contributed $220,000 per year to St. Joseph's. If the other eighteen beds were filled, the result would be an additional $194,400 each year (18 beds X $900 per month from each resident X 12 months per year). Thus, even full, St. Joseph's would have operated with a deficit of $25,600 annually ($220,000–$194,000). (*See* Hearing of December 6, 1993, N.T. at 13, 16–18.)

In further support of their position that St. Joseph's was not operated primarily for religious purposes, Claimants assert that residents and employees of St. Joseph's did not have to be Catholic and that employees did not teach religion or offer any other religious service to the residents. The Diocese, however, asserts that the focus here should not be on the qualifications or job duties of the employees but, instead, on why the Diocese operated St. Joseph's. The Diocese maintains that it operated St. Joseph's as a ministry.

[8.] The Board did not submit a brief in this case, explaining that it now supports the Claimants' position based on our recent decision in *Pittsburgh Leadership Foundation v. Unemployment Compensation Board of Review,* —— Pa.Commonwealth Ct. ——, 654 A.2d 224 (1995). In *Pitts-*

■ In *Christian School Association of Greater Harrisburg v. Department of Labor and Industry*, 55 Pa.Commonwealth Ct. 555, 561, 423 A.2d 1340, 1343 (1980) (emphasis added), in which we determined that certain religious schools were operated primarily for religious purposes,[9] we looked closely at subsection (ii) of section 4(*l*)(4)(8)(a) of the Law and stated:

> the words "operated primarily for religious purposes" create an imprecise standard which lends itself to different interpretations, and ... such an exemption would normally be given a strict construction with all doubts construed against the [employer].... *[H]owever, that rule of strict construction is superseded in instances where there is a strong possibility that the statute in question infringes upon a party's right to the free exercise of religion.*

Whether or not a statute unconstitutionally infringes upon the free exercise of religion depends largely upon the degree to which the statute imposes a direct burden or a severe but indirect burden upon the ability to practice one's religion. *Christian School As-*

sociation, citing *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972).

■ Here, imposition of the Law upon the Diocese would mean added tax liability for the Diocese, increased record keeping for the Diocese and required participation in eligibility hearings for former employees. *See Christian School Association.* These indirect financial burdens could escalate the cost of ministry to the point where the Diocese could no longer practice its religion by providing assistance to poor and elderly persons through personal care facilities.[10] Thus, because of the risk of infringement upon the first amendment rights of the Diocese here, we are not inclined to strictly construe subsection (ii) of section 4(*l*)(4)(8)(a) of the Law against the Diocese.[11]

We believe that subsection (ii) of section 4(*l*)(4)(8)(a) of the Law can be properly understood by examining the interpretation of a parallel provision in federal law, i.e., section 3309(b) of the Federal Unemployment Tax Act (FUTA).[12] In *St. Martin Evangelical Lutheran Church v. South Dakota*, 451 U.S.

---

*burgh Leadership Foundation*, we affirmed the Board's determination that a Christian non-profit corporation that sponsors counseling for troubled youth, prisoners, addicts and victims of abuse is *not* "operated primarily for religious purposes" because it does not require its employees to be members of the clergy, because it is controlled by a board of directors that includes only two members of the clergy, and because it is not principally supported by a church or association of churches.

We disagree that *Pittsburgh Leadership Foundation* is dispositive here. First, there is no question here that St. Joseph's was operated, supervised, controlled or principally supported by the Diocese, which is an association of churches. Second, the record indicates that the bishop of the Diocese, a clergyman, is in ultimate control of St. Joseph's. Third, St. Joseph's is not a separately incorporated non-profit organization but, rather, is under the direct control of the Diocese's central administrative offices. Thus, *Pittsburgh Leadership Foundation* does not govern here.

9. Offering a reasonable interpretation of subsection (ii) of section 4(*l*)(4)(8)(a) of the Law, we stated with respect to the religious schools that in spite of the time devoted to secular subjects, each religious school attempted to emphasize its respective religious principles on a daily basis even in its presentation of secular subjects. *Christian School Association.*

10. Indeed, in this case, even without the increased costs, the Diocese decided to discontinue its ministry at St. Joseph's in order to better utilize available financial resources to minister to the poor and elderly. (*See* Hearing of December 6, 1993, N.T. at 16–17.)

11. We also stated in *Christian School Association* that the Law will not apply to an organization if the Law tends to jeopardize the religious freedom of the organization *unless* the legislature clearly intended such a result. *Christian School Association*, citing *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979) (emphasis added). We cannot say that the language of subsection (ii) of section 4(*l*)(4)(8)(a) of the Law manifests a clear intent to subject an organization like St. Joseph's to the provisions of the Law.

12. Section 3309(b) of FUTA, 26 U.S.C. § 3309(b), states in pertinent part:

> This section shall not apply to service performed—
> (1) in the employ of (A) a church or convention or association of churches, or (B) an organization which is operated primarily for religious purposes and which is operated, supervised, controlled, or principally supported by a church or convention or association of churches....

772, 781, 101 S.Ct. 2142, 2147, 68 L.Ed.2d 612 (1981) (emphasis added), the United States Supreme Court considered the meaning of section 3309(b) of FUTA and, quoting the House Report on FUTA, stated:

> [T]he services of the janitor of a church would be excluded, but services of a janitor for a *separately incorporated* college, although it may be church related, would be covered. ... [A] church related (*separately incorporated*) charitable organization (such as, for example, an orphanage *or a home for the aged*) would not be considered under this paragraph to be operated primarily for religious purposes.

Thus, the Court drew a distinction between employees of a church and employees of church-related but separately incorporated organizations. Here, because St. Joseph's was not a separately incorporated legal entity but, rather, was under the direct control of the Diocese, we conclude that the Diocese operated St. Joseph's primarily for religious purposes.[13]

Accordingly, we affirm.

### ORDER

AND NOW, this 17th day of April, 1995, the orders of the Unemployment Compensation Board of Review, dated January 11, 1994 (Decision No. B–321317), January 24, 1994 (Decision No. B–321516), and April 1, 1994 (Decision Nos. B–324007 & B–324008), are AFFIRMED.

RODGERS, Senior Judge concurs in the result only.

---

13. The Diocese notes that the Board also reversed the Petronelis and Peterson decisions based on subsection (i) of section 4(*l*)(4)(8)(a) of the Law, i.e., the Board determined that work done for St. Joseph's was "[s]ervice performed in the employ of (i) a church or ... association of churches." 43 P.S. § 753(*l*)(4)(8)(a). We agree.

The Board found that Claimants were paid by the Diocese, an association of churches, and were subject to its personnel policies and practices. (Petronelis and Peterson, Board's Finding of Fact, No. 12.) Thus, the work done by Claimants at St. Joseph's was service performed in the employ of an association of churches.