LEON BLEICH *vs.* MAIMONIDES SCHOOL & another.[1]

Norfolk. February 9, 2006. - June 16, 2006.

Present: MARSHALL, C.J., GREANEY, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Employment Security,* Eligibility for benefits, Church-operated schools. *Taxation,* Exemption. *Statute,* Construction.

In an appeal by a former employee of a school who applied for and was denied unemployment benefits, this court concluded that the division of unemployment assistance properly determined that the school, whose corporate purposes include maintaining a place of worship according to Orthodox Jewish rites and instructing Jewish students in the teachings of Orthodox Judaism, was exempt from the State unemployment tax as an organization "operated primarily for religious purposes" that is "principally supported by a church or convention or association of churches," in the form of area Jewish synagogues and other Jewish organizations, pursuant to G. L. c. 151A, § 6 (*r*). [41-48]

CIVIL ACTION commenced in the Brookline Division of the District Court Department on May 29, 2003.

The case was heard by *Margaret A. Zaleski,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Michael Magerer* for the plaintiff.

*Michael R. Coppock* for Maimonides School.

*James J. Arguin,* Assistant Attorney General, for Division of Unemployment Assistance.

MARSHALL, C.J. The division of unemployment assistance (division)[2] determined that Maimonides School (Maimonides),[3]

___

[1]The director of the division of unemployment assistance.

[2]The division, currently within the Department of Workforce Development, see G. L. c. 6A, § 16G (*e*), inserted by St. 2003, c. 26, § 550, was formerly within the Executive Office of Economic Affairs and was known as the Department of Employment and Training and the division of employment security, see St. 1990, c. 177, § 247.

[3]From 1938 until 1953, the *Maimonides School was known as the Mai-*

whose corporate purposes include maintaining a place of worship according to Orthodox Jewish rites and instructing Jewish students in the teachings of Orthodox Judaism, is exempt from the State unemployment tax as a "church or convention or association of churches, or an organization which is operated primarily for religious purposes and which is operated, supervised, controlled, or principally supported by a church or convention or association of churches." G. L. c. 151A, § 6 (*r*). That determination is challenged in this appeal by a former employee of Maimonides who applied for and was denied unemployment benefits. Because we conclude that Maimonides is both "operated primarily for religious purposes" and "principally supported" by Jewish synagogues and other Jewish organizations, we now affirm.

1. *Background.* From March 1, 1988, until his discharge on October 18, 2002, the plaintiff, Leon Bleich, was employed by Maimonides as a tuition and scholarship administrator. Following his discharge, the plaintiff filed a claim for unemployment benefits, which the division denied. The plaintiff appealed to the division's hearings department. After a hearing, a review examiner determined that the plaintiff was ineligible for unemployment benefits because the wages he earned from Maimonides were exempt from taxation pursuant to G. L. c. 151A, § 6 (*r*).[4] He appealed from that determination to the division's board of review (board), which denied his application for further review, making the decision of the review examiner the final decision of the board. See G. L. c. 151A, § 41 (*c*) (if application for review is denied, decision is "deemed" decision of board for purpose of judicial review). See also *Starks* v. *Director of the Div. of Employment Sec.*, 391 Mass. 640, 640 n.2

monides Educational Institute, Inc.

[4]The review examiner concluded that Maimonides satisfied the requirements of G. L. c. 151A, § 6 (*r*), because the plaintiff was employed by a "church or convention or association of churches" (the first prong) or because Maimonides is operated "primarily for religious purposes" and is "operated, supervised, controlled, or principally supported" by, in the words of the examiner, a "church community" (the second prong). He noted that, "[a]lthough there is no hierarchical Jewish Church, the school was founded by Orthodox Jews to further the [tenets] of Orthodox Judaism, and these people, including the people who continu[e] to run the school, are a 'church community' as contemplated by the Law."

(1984) (where board denies application for review, review examiner's findings treated as findings of board).

The plaintiff sought judicial review of the board's determination pursuant to G. L. c. 151A, § 42.[5] A judge in the Brookline Division of the District Court Department affirmed the board. Relying on *Ursuline Academy, Inc.* v. *Director of the Div. of Employment Sec.*, 383 Mass. 882 (1981), the judge concluded that to deny Maimonides the statutory exemption for unemployment compensation contributions would violate the establishment and free exercise clauses of the First Amendment to the United States Constitution and "various" provisions of the Massachusetts Constitution, because a contrary ruling would prefer a hierarchical religion, such as the Roman Catholic Church, over the Jewish religion. The plaintiff appealed, and we transferred the case here on our own motion. For reasons different from those of the judge, we affirm.

2. *Facts.* We first describe Maimonides, supplementing as necessary the findings of the review examiner with the unchallenged evidence before him. The review examiner found, and the record supports, the following:

> "[Maimonides] was incorporated in 1938 for the purpose of maintaining a place of worship according to the Orthodox Hebrew rite, the instruction of Jewish youth in the [tenets] of the Jewish religion and, among other things, to maintain and operate a school for the dissemination and teaching of Hebrew religious and literary works based upon Orthodox traditional Judaism together with English secular education in co-ordination with and under the supervision of the public school authorities and covering all subjects taught in the elementary and high school grades of our public schools."

Maimonides is governed by a board of directors who are appointed by members of the Maimonides corporation, described by the executive vice-president of Maimonides, Leora Joseph, as a small "self-perpetuating group" that acts as the school's "overseers." The board of directors, in turn, appoints a "school

---

[5]General Laws c. 151A, § 42, provides for judicial review of any proceeding before the board of review (board) under G. L. c. 30A.

committee," which oversees the school's curriculum. According to Joseph, teaching the tenets of Orthodox Judaism is an integral part of the school's curriculum.[6] The senior administrators of the school are required to be Orthodox Jews, approximately fifty per cent of the faculty is Jewish, and all teachers of Jewish instruction are Orthodox Jews. All students are required to participate in daily worship services led in a synagogue on the school's premises by Orthodox rabbis. The school also offers extracurricular programs related to the Jewish faith. Maimonides has close relationships with Orthodox synagogues in the Boston area, from which it recruits many of its students. The synagogues, which are separate entities, are not involved in the internal policies or daily governance of Maimonides, but collaborate with each other and with the school. Joseph described the school's relationships with the synagogues as "supported relationships of recruitment, of exchanging personnel, of getting speakers, of community building, and community relations." Tuition is the main source of the school's funding, although Maimonides engages in its own fundraising and, as found by the review examiner, receives "substantial funding" from Combined Jewish Philanthropies.

Maimonides employs approximately 120 people full time and twenty part time. It does not make contributions to the Federal or State unemployment systems, in accordance with Federal and State determinations to that effect.[7]

3. *Discussion.* In 1935, responding to widespread unemployment, Congress established a cooperative Federal-State program to provide benefits to unemployed workers. See *St. Martin Evangelical Lutheran Church* v. *South Dakota*, 451 U.S. 772,

---

[6]The mission statement of Maimonides, which was submitted in evidence, states that the school's mission is to "produce religiously observant, educated Jews who will remain faithful to their religious beliefs, values, and practices as they take their place as contributing members of the general society."

[7]In 1951 the United States Treasury Department issued a determination exempting Maimonides from Federal income tax because the school is "organized and operated exclusively for religious and educational purposes." In 1981, the division issued a "redetermination" to the effect that Maimonides is not required to make payments to the Commonwealth's unemployment fund, and services of Maimonides employees are exempt under G. L. c. 151A, § 6 (*r*).

775 (1981). The program, which now appears as the Federal Unemployment Tax Act (FUTA), 26 U.S.C. §§ 3301-3311 (2000),[8] imposes a Federal excise tax on all employers, except those specifically exempted by Congress. See *California v. Grace Brethren Church*, 457 U.S. 393, 396-397 (1982). Congress further provided that employers could avoid a significant portion of the Federal tax by payment into federally approved State unemployment programs where those were available.[9] See *id.* at 397. Massachusetts quickly took advantage of the Federal incentive by formulating its own unemployment benefits program, G. L. c. 151A, inserted by St. 1935, c. 479, § 5, which governs unemployment benefits in the Commonwealth. All other States have similarly enacted unemployment compensation laws providing at least the minimum coverage mandated by FUTA. See *St. Martin Evangelical Lutheran Church* v. *South Dakota, supra* at 775 n.3.

Under G. L. c. 151A, employers[10] cover the costs of unemployment benefits by making payroll tax contributions to the Commonwealth for credit to the unemployment compensation fund, G. L. c. 151A, § 13, unless the service performed by their employees is excluded from the definition of "employment" by the provisions of G. L. c. 151A, §§ 6 or 6A. See G. L. c. 151A, § 14 (establishing method for calculation of payroll taxes); G. L. c. 151A, § 14A (alternative payment option for nonprofit organizations and governmental employers to

---

[8]The Federal Unemployment Tax Act (FUTA), 26 U.S.C. § 3301-3311 (2000), was originally enacted as Title IX of the Social Security Act of 1935.

[9]Pursuant to 26 U.S.C. § 3304(a), the United States Secretary of Labor approves State laws that conform to the requirements of FUTA, and certifies on a yearly basis that such laws remain in conformance. 26 U.S.C. § 3304(c). To retain Federal approval, State programs must " 'cover' certain broad categories of employment," as provided in 26 U.S.C. §§ 3304 and 3309, *California v. Grace Brethren Church*, 457 U.S. 393, 397 & n.5 (1982), although States are "free to expand [their] coverage beyond the federal minimum without jeopardizing [their] federal certification." *St. Martin Evangelical Lutheran Church* v. *South Dakota*, 451 U.S. 772, 775 n.3 (1981). FUTA has been amended several times since 1935, and "[i]n response to each federal amendment, the States correspondingly have amended their statutes to retain their federal certifications." *Id.* at 775 n.4.

[10]General Laws c. 151A, § 8, describes employers who are subject to the provisions of the chapter.

make contributions); §§ 6, 6A (excluding certain services from definition of "employment"). Cf. 26 U.S.C. § 3309 (exempting from mandatory State coverage services performed for certain employers or by certain individuals). To be eligible for unemployment benefits, an individual must satisfy the requirements of G. L. c. 151A, § 24, which provides in part that the individual must have been paid "wages" by his former employer that constituted "employment" for purposes of G. L. c. 151A. See G. L. c. 151A, § 1 (k), (s) (A).

The issue in this case is whether the division properly determined that the services provided by the plaintiff to Maimonides fall within the employment exclusion of G. L. c. 151A, § 6 (r),[11] thereby excluding the plaintiff from unemployment benefits.[12] We review the board's decision "to determine whether the review examiner applied the correct legal principles in denying unemployment compensation benefits to the plaintiff [and] whether [his] findings are supported by substantial evidence." Quintal v. Commissioner of the Dep't of Employment & Training, 418 Mass. 855, 858-859 (1994). See Guarino v. Director of the Div. of Employment Sec., 393 Mass. 89, 92 (1984). See also G. L. c. 30A, § 14 (7).

The plaintiff maintains that Maimonides does not qualify for exemption under the statute because the school is not a "church" as contemplated by the first prong of G. L. c. 151A, § 6 (r). See note 11, supra. As to the second prong of G. L. c. 151A, § 6 (r), the plaintiff concedes that Maimonides is "operated primarily for religious purposes," but argues that

---

[11]General Laws c. 151A, § 6 (r), excludes from the definition of "employment" any "[s]ervice performed in the employ of a church or convention or association of churches, or an organization which is operated primarily for religious purposes and which is operated, supervised, controlled, or principally supported by a church or convention or association of churches" (emphasis added).

[12]With one exception, G. L. c. 151A, § 6 (r), mirrors its Federal counterpart, 26 U.S.C. § 3309(b)(1), which excludes services performed for certain religious organizations from mandatory unemployment insurance coverage. A 1997 amendment to FUTA established an additional exemption for service performed for "an elementary or secondary school which is operated for primarily religious purposes, which is described in [§] 501(c)(3), and which is exempt from tax under [§] 501(a)." 26 U.S.C. § 3309(b)(1)(C).

Maimonides is not "operated, supervised, controlled, or principally supported by a church or convention or association of churches," and therefore not exempt. In this regard the plaintiff notes that Maimonides is entirely internally governed; is not bound by the rulings or authority of any other religious body; sets its own funding, staffing, and curriculum determinations; and is financially supported in the main by tuition, its own fundraising, and an endowment. The plaintiff further argues that, to the extent that it cooperates with any external body, it coordinates with and is under the supervision of the public school authorities with respect to teaching in its elementary and secondary school classes.

For its part, Maimonides agrees that, as to the second prong of G. L. c. 151A, § 6 (*r*), it operates "primarily for religious purposes." But in the District Court and again on appeal it submits that it is not "operated, supervised, controlled, or principally supported by a church or convention or association of churches," interpreting that aspect of the statute narrowly to apply only to "hierarchically controlled" schools such as those operating under the authority of the Roman Catholic Church.[13]

[13]Maimonides claims that it is exempt under the statute because it is a "church," satisfying the first prong of G. L. c. 151A, § 6 (*r*). It points to its articles of organization, which provide that the purposes of Maimonides are in part to "maintain a place of worship, according to the Orthodox Hebrew rite," adding that there is a synagogue on the premises where "a rabbi leads daily worship services for the faculty and students as well as members of the community." Concerning religious schools, the United States Supreme Court has construed service performed "in the employ of . . . a church or convention or association of churches" within the meaning of 26 U.S.C. § 3309(b)(1)(A), the Federal counterpart of the first prong of G. L. c. 151A, § 6 (*r*), to include *only* "schools that have *no* legal identity separate from a church" (emphasis added). *St. Martin Evangelical Lutheran Church* v. *South Dakota*, 451 U.S. 772, 782-783 n.12 (1981). This would exclude Maimonides as a religious *school*, as it is separately incorporated. Whether Maimonides itself constitutes the Jewish equivalent of a "church" is a question we need not resolve in light of our conclusion that Maimonides is exempt under the second prong of the statute. Massachusetts may exempt a religious school such as Maimonides from coverage under G. L. c. 151A, § 6 (*r*), without risking the Commonwealth's Federal certification because Maimonides would qualify for an exemption under the 1997 amendment to FUTA, see note 12, *supra*, as a § 501(c)(3) "elementary or secondary school which is operated for religious purposes." 26 U.S.C. § 3309(b)(1)(C).

We conclude that neither the plaintiff nor Maimonides correctly interprets the second prong of G. L. c. 151A, § 6 (r).[14]

Because the plaintiff and Maimonides agree, and as the review examiner found, Maimonides satisfies the "primary purpose" component of that statute, the crucial issue in this case is whether Maimonides is "operated, supervised, controlled, or principally supported by a church or convention or association of churches." G. L. c. 151A, § 6 (r). See 26 U.S.C. § 3309(b)(1)(B). We have twice interpreted G. L. c. 151A, § 6 (r), as it applies to services performed for an employer operating "primarily for religious purposes" when the employer has a legal identity separate from a "church or convention or association of churches." In both cases we concluded that the employer was exempt from unemployment contributions because the entity was "controlled" by a church. See *Kendall* v. *Director of the Div. of Employment Sec.*, 393 Mass. 731, 733 (1985) (separately incorporated education facility for developmentally disabled children and young adults subject to control of Roman Catholic Archbishop of Boston qualified for exemption); *Ursuline Academy, Inc.* v. *Director of the Div. of Employment Sec.*, 383 Mass. 882 (1981) (separately incorporated parochial school subject to control of Roman Catholic Bishop of Springfield qualified for exemption).[15] Cf. *St. Martin Evangelical Lutheran Church* v. *South Dakota*, 451 U.S. 772, 782-783 n.12 (1981) ("To establish exemption from [FUTA], a *separately incorporated* church school . . . must satisfy the

---

[14]Maimonides also challenges the constitutionality of G. L. c. 151A, § 6(r), arguing that the statute favors hierarchically organized religions and therefore violates the establishment and free exercise clauses of the First Amendment to the United States Constitution, as well as various provisions of the Massachusetts Constitution. We need not reach the question because we affirm the judgment on the alternative ground that the board correctly interpreted the statute in ruling that Maimonides does in fact qualify for exemption under G. L. c. 151A, § 6 (r). See *Commonwealth* v. *Bartlett*, 374 Mass. 744, 749 (1978), quoting *Ashwander* v. *Tennessee Valley Auth.*, 297 U.S. 288, 347-348 (1936) (Brandeis, J., concurring) ("if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter").

[15]In *Director of the Div. of Employment Sec.* v. *Roman Catholic Bishop of Springfield*, 383 Mass. 501, 501-502 (1981), the church-operated elementary and secondary schools that we held were exempt from unemployment compensation were *not* separately incorporated from the church itself.

requirements of § 3309[b][1][B]," i.e., that it is "operated primarily for religious purposes," and "operated, supervised, controlled, or principally supported by a church or convention or association of churches"). In both Massachusetts cases, the schools at issue were subject to the local authority of the Roman Catholic Church, a hierarchically organized religion, and the supervision or control requirements of G. L. c. 151A, § 6 (*r*), could readily be established. In contrast, Maimonides, a Jewish school, is not "controlled" by a hierarchical religion. We nevertheless conclude that Maimonides does meet the statutory requirements for exemption from unemployment tax contributions.

Whether an entity is "operated," "supervised," "controlled," or "principally supported" by a church is an inquiry concerning "four *alternative* statutory requirements" (emphasis added). *Kendall* v. *Director of the Div. of Employment Sec., supra* at 736. We reject the plaintiff's implicit suggestion that to qualify as an exempt employer, a separately incorporated religious institution must be "operated," "supervised," or "controlled," by a church. As the division correctly points out, the Legislature provided that an organization operated primarily for religious purposes may qualify for exemption if it is merely "principally supported" by a "church or convention or association of churches."[16] General Laws c. 151A, § 6 (*r*), uses "or" to specify the criteria for exemption under its second prong. It is fundamental to statutory construction that the word "or" is disjunctive "unless the context and the main purpose of all the

[16]We construe the term "church" to include synagogues or other non-Christian organized religious bodies. Cf. *Gorodetzer* v. *Kraft*, 360 Mass. 743, 745 (1972), quoting *Moustakis* v. *Hellenic Orthodox Soc'y of Salem & Peabody*, 261 Mass. 462, 466 (1928) (analyzing litigation encompassing regulation of kosher foods by Jewish authorities to determine whether it involves "an issue which is essentially ecclesiastical in nature" because "sound policy dictates that the denominations, and not the courts, interpret 'their own body of church polity' "); *United Kosher Butchers Ass'n* v. *Associated Synagogues of Greater Boston, Inc.*, 349 Mass. 595, 599 (1965) (relying on precedent involving churches to determine that court should refuse to consider issue "which is so exclusively one of [Jewish] religious practice and conscience"); *Cohen* v. *Silver*, 277 Mass. 230, 233, 236 (1931) (referring to Orthodox Jewish rabbis, members of "religiously constituted board" that regulated sale of kosher meat, as "authoritative ecclesiastical tribunal" with distinctive "church polity and beliefs").

words demand otherwise." *Eastern Mass. St. Ry.* v. *Massachusetts Bay Transp. Auth.*, 350 Mass. 340, 343 (1966). As long as Maimonides is "principally supported" by Jewish religious organizations, it satisfies the statutory exemption. On the undisputed record there can be no doubt that Maimonides is "principally supported" by such organizations and that the statutory exemption is therefore satisfied.

We recognize that Maimonides is largely self-governing. But the school is grounded in the Jewish religion and derives substantial support from area synagogues and other Jewish organizations. "Support," as used in G. L. c. 151A, § 6 (*r*), is not limited to financial support. Cf. *Nampa Christian Schs. Found., Inc.* v. *State Dep't of Employment*, 110 Idaho 918, 924 (1986) (exemption "does not require a church's or group of churches' support to be *financial* in order for that to be recognizable under the statute. . . . The key is the *quality* of the support"). As the review examiner found, Maimonides is supported by synagogues and other Jewish organizations in diverse ways. The school recruits from area synagogues the students who pay the tuition and fees that account for a significant part of the school's operating budget. There was uncontested evidence that Maimonides relies on members of surrounding Jewish synagogues to operate the school: the board of directors and school committee both include rabbis and members from local synagogues. The school requires that rabbis, presumably drawn from local Jewish synagogues, head the elementary and high schools, as well as the synagogue on its premises. Teachers providing religious instruction are Orthodox Jews, also presumably drawn from local synagogues. The school raises funds from local synagogues, as well as from Combined Jewish Philanthropies, which is itself an organization that raises and distributes funds to Jewish institutions such as Maimonides. As the division argues, and we agree, the school's "existence depends upon these essential relationships with members of other temples, synagogues and Jewish organizations, to provide financial and moral support."

For all of these reasons, the division correctly determined that Maimonides is exempt from the State unemployment tax as an organization "operated primarily for religious purposes" that

is "principally supported" by a "church or convention or association of churches." G. L. c. 151A, § 6 (*r*). See *Guarino* v. *Director of the Div. of Employment Sec.*, 393 Mass. 89, 92 (1984).

*Judgment affirmed.*