## LOBISSER BUILDING CORP. & another[1] *vs.* PLANNING BOARD OF BELLINGHAM.

Suffolk. March 5, 2009. - June 22, 2009.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Zoning,* Judicial review, Special permit, Condominium, Lapse of permit. *Statute,* Construction. *Words,* "Phasing."

Rights under a special permit for a phased construction project, originally approved by a local planning board in 1985, had not lapsed within the meaning of G. L. c. 40A, § 9, or a local bylaw, despite an extended pause in construction, where construction of the first phase of the project had commenced within the applicable time period; where nothing in the statute suggested that substantial use or construction for each phase of the project had to begin within one year, or that each phase of the project was subject to its own lapse period; and where the special permit itself contained no time limit. [126-134]

CIVIL ACTION commenced in the Land Court Department on March 20, 2007.

The case was heard by *Keith C. Long,* J., on a motion for summary judgment.

The Supreme Judicial Court granted an application for direct appellate review.

*Thomas O. Moriarty (Katherine G. Brady* with him) for the plaintiffs.

*Jason R. Talerman (Lynnea Thody* with him) for the defendant.

The following submitted briefs for amici curiae:

*James M. Burgoyne, Charles N. Le Ray, & Paul F. Alphen* for The Abstract Club & another.

*Charles A. Perkins, Jr., Andrew C. Oatway, & Adam P. Whitney* for Community Associations Institute.

*Howard M. Brown & Stephen V. Saia* for Frank R. Saia.

MARSHALL, C.J. The plaintiffs in this case, Lobisser Building Corp. (Lobisser) and Crystal Springs Condominium Association, Inc. (association), filed a complaint in the Land Court appealing

[1]Crystal Springs Condominium Association, Inc.

from a decision of the planning board of Bellingham (board) denying their application for a modification of a special permit and for development plan approval. The plaintiffs asserted that the board's decision that the special permit had lapsed and that the issue of ownership of development rights was unresolved were in excess of the board's authority. A judge in the Land Court entered summary judgment in part for the plaintiffs and in part for the board, agreeing with the board's decision that the special permit had lapsed pursuant to G. L. c. 40A, § 9, but also finding that the association had validly amended its master deed, pursuant to G. L. c. 183A, § 5 (*b*) (2) (iii), to develop additional condominium units. The plaintiffs appealed from that part of the decision upholding the board's decision that the special permit had lapsed, and we granted their application for direct appellate review.[2] Because we conclude the special permit has not lapsed, we reverse the decision of the Land Court.[3]

1. *Background.* In December, 1985, the board granted the Onallam Realty Trust (trust) a special permit to construct eighty-four townhouse condominium units under § 4400 of the Bellingham zoning bylaw. The special permit included several conditions, two of which are relevant here:

"3. Plans shall be submitted under Section 1420 Site Plan Review, in annual phases . . . .

"5. Building permits shall not authorize construction of more than the following cumulative totals of dwelling units:

"Prior to January 1, 1987: 21 units, to begin at South Main Street;

"Prior to January 1, 1988: 42 units;

"Prior to January 1, 1989: 63 units;

"Prior to January 1, 1990: 84 units."

---

[2]The board has not appealed from that part of the Land Court's decision declaring that the association validly amended its master deed, and that issue is thus not before us.

[3]We acknowledge the amicus briefs submitted in support of the plaintiffs by The Abstract Club and the Real Estate Bar Association for Massachusetts; the Community Associations Institute; and Frank R. Saia.

The permit thus contemplated a phased build-out, with no more than twenty-one units being built in any given year. The town building inspector issued the first building permit, for phase I, in April, 1986. In March, 1987, the first occupancy permit was issued, and the Crystal Springs Condominium was established with the recording of the master deed with the Norfolk County registry of deeds.[4] As established, the condominium included twenty-one units in five buildings, with the right to add three additional phases to include an additional sixty-three units (i.e., phases II, III, and IV as indicated by the special permit).

The master deed was amended in September, 1987, to include the units of phase II, the plans for which had been submitted to the board pursuant to special permit condition no. 3 in January, 1987. Phase II would consist of five additional buildings with four units each, bringing the total number of units in the condominium to forty-one and in keeping with special permit condition no. 5 requiring that no more than forty-two units would be built prior to January 1, 1988. In the spring of 1988, an issue arose with the Bellingham town sewer system and a letter from the water-sewer department to the board requested an extension of time for the trust to submit to the board the plans for phase III of the project. The board and the trust then agreed that a written extension would not be necessary if the trust chose to delay construction of phases III and IV of the project, and that construction would resume when the municipal sewer system became available. No further construction took place, however, after the construction of phase II, even after the sewer system became available.

Nothing in the record before us indicates the reason for the cessation of the project at that time, and it appears that no further action related to the project occurred until the fall of 2005, when KML Holdings Corp. entered into an agreement with the association to purchase the development and phasing rights from the association, which had voted to revive the rights to develop addi-

---

[4]The master deed also established the plaintiff association, which, according to the master deed "shall be the organization of Unit Owners organized pursuant to Chapter 180 of the General Laws of Massachusetts, to manage and regulate the [Crystal Springs] Condominium pursuant to the By-Laws of the Association, . . . [the master deed], and Chapter 183A of the General Laws of Massachusetts."

tional units in the condominium. The master deed was accordingly amended, and in December, 2006, Lobisser applied to the board for a modification of the special permit and for development plan approval.[5]

At the board meeting at which the application was discussed, the board voted to deny the application on the basis that the special permit had lapsed. The plaintiffs then filed their complaint in the Land Court, pursuant to G. L. c. 40A, § 17, appealing from the board's decision and presenting two issues: whether the rights under the special permit for a phased construction project had lapsed within the meaning of G. L. c. 40A, § 9; and whether the association had validly amended the master deed to allow the construction of phases III and IV of the project. On the plaintiffs' motion for summary judgment, the Land Court judge entered judgment in favor of the board on the issue of lapse and in favor of the plaintiffs on the issue whether the association had validly amended the master deed.[6]

2. *Discussion.* Massachusetts law provides for de novo review of local zoning authority decisions. See *Roberts* v. *Southwestern Bell Mobile Sys., Inc.,* 429 Mass. 478, 485 (1999). "On appeal to the Superior Court or Land Court, a judge determines the legal validity of a zoning board decision on the facts found by him; he gives no evidentiary weight to the board's findings."

---

[5]The record does not indicate the specific nature of the relationship between KML Holdings Corp., the company that entered into the purchase and sale agreement with the association to purchase the association's development rights, and Lobisser, the company that now appears to be the prospective owner of those rights. Although Kevin Lobisser signed the purchase and sale agreement on behalf of KML, there is no indication that Lobisser and KML are one and the same or that KML somehow transferred or assigned its prospective development rights to Lobisser. The parties, however, do not raise the issue, and we therefore presume that Lobisser is the prospective owner of the rights.

[6]In his initial decision, the Land Court judge addressed only the issue of lapse. He deferred ruling on the issue whether the association had validly amended the master deed on the basis that the record before him was insufficient on that issue. He allowed the plaintiffs to supplement the record and after they had done so, he determined that the association had validly amended the master deed, reviving the rights to develop additional condominium units. It appears that the transfer or sale of those rights by the association to Lobisser was made contingent on the board's granting the application for special permit modification and for development plan approval. As the board has not granted that application, Lobisser remains a prospective purchaser of, and the association continues to own, the development rights.

*Id.* at 485-486, citing *Josephs* v. *Board of Appeals of Brookline*, 362 Mass. 290, 295 (1972). Judicial review is, however, circumscribed and the decision of the board "cannot be disturbed unless it is based on a legally untenable ground, or is unreasonable, whimsical, capricious or arbitrary." *MacGibbon* v. *Board of Appeals of Duxbury*, 356 Mass. 635, 639 (1970), citing *Gulf Oil Corp.* v. *Board of Appeals of Framingham*, 355 Mass. 275, 277 (1969). In this case, the board's decision, and the judge's affirmance of it, are not based on a legally tenable ground and cannot stand.

General Laws c. 40A, § 9, dictates that "[z]oning ordinances or by-laws shall provide for specific types of uses which shall only be permitted in specified districts upon the issuance of a special permit" and that "such permits may . . . impose conditions, safeguards and limitations on time or use." The statute also requires that such ordinances or bylaws "provide that a special permit . . . shall lapse within a specified period of time, not more than two years, which shall not include such time required to pursue or await the determination of an appeal referred to in section seventeen [judicial review], from the grant thereof, if a substantial use thereof has not sooner commenced except for good cause or, in the case of permit for construction, if construction has not begun by such date except for good cause."

In accordance with the statute, the town of Bellingham enacted zoning bylaw 1500, governing the issuance of special permits. Of relevance here is § 1550, which provides that a special permit will lapse if "a substantial use thereof or construction has not begun" within twelve months of special permit approval.[7]

No one disputes that the board approved a valid special permit for the plaintiffs' predecessor in 1985 for the construction of eighty-four condominium units with construction to be performed in phases, and that the first two phases of construction were completed as contemplated by the special permit. As required by condition no. 5 of the special permit, no more than twenty-one

[7]Section 1550 provides in full that "[s]pecial permits shall lapse within 12 months of Special Permit approval (plus such time required to pursue or await the determination of an appeal referred to in [G. L. c. 40A, § 17], from the grant thereof) if a substantial use thereof or construction has not begun, except for good cause."

units were built prior to January 1, 1987, and no more than forty-two units were built prior to January 1, 1988. In fact, only forty-one units were in existence as of the latter date. After the completion of the first two phases, however, no further construction or activity took place until the plaintiffs applied to the board for the modification of the special permit and for development plan approval in December, 2006.

The board denied the application, with little explanation, on the basis that the special permit had lapsed.[8] Although the board's decision says little, the minutes of the board meeting at which the plaintiffs' application was discussed and at which the board voted to deny the application suggest that the bases for denial include the fact that annual plans had not been submitted since 1988, presumably as required by condition no. 3 of the special permit; and that the association had not requested additional sewer capacity once it became available. The judge, in turn, based his decision that the special permit had lapsed on the fact that, in his view, the time period within which to "fully exercise development rights" under the special permit — that is, one year (as dictated by § 1550 of the bylaw) — had passed and that substantial use "of the type that would preserve development rights to phases III and IV under the special permit has not commenced."[9] He noted that no construction beyond that which was needed for phases I and II of the project had begun and that only use of the existing forty-one units, and common areas and roadways for those units, had commenced. He also considered the failure to submit any annual plans after those for phases I and II and the failure to reserve sewer capacity for addi-

---

[8]The board also stated that it was denying the plaintiffs' application "due to the unresolved issue of the ownership of the Development Rights." As previously noted, the judge determined that the association has properly revived the development rights and that issue is not before us. See note 2, *supra.*

[9]The judge states in his decision that the parties agree that the special permit "provided for a five-year build out." While that is true, the plaintiffs also clearly set forth their view, in their statement of undisputed material facts submitted in support of their motion for summary judgment, that the special permit "does not, by its own terms, place a time limit on the construction either in totality, or for each phase." The board, of course, disagrees. We reject any suggestion by the judge that the plaintiffs conceded that the special permit included a time limit for construction or that the time period within which to "fully exercise development rights under the special permit" had passed.

tional units (i.e., the units to be constructed as part of phases III and IV) when the sewer system became available.

General Laws c. 40A, § 9, and § 1550 of the bylaw provide that either substantial use or construction must commence within the applicable time period, in this case one year, to avoid lapse of the special permit. There is no question that construction commenced within that period. Although that construction was for phase I of the project — for the first twenty-one units and for attendant common areas and roadways — nothing in G. L. c. 40A, § 9, indicates that anything more is necessary to prevent lapse of the special permit. Certainly only the commencement of substantial use *or* construction is necessary, as indicated by the disjunctive language of the statute. See *Bleich* v. *Maimonides Sch.*, 447 Mass. 38, 46-47 (2006), quoting *Eastern Mass. St. Ry.* v. *Massachusetts Bay Transp. Auth.*, 350 Mass. 340, 343 (1966) (fundamental to statutory construction that word "or" is disjunctive unless context and main purpose of all words require otherwise). Cf. *McDermott* v. *Board of Appeals of Melrose*, 59 Mass. App. Ct. 457, 461-462 (2003) (special permit, which did not contemplate construction, did not lapse where substantial use made within two years even though permit not recorded).

Furthermore, nothing in the statute suggests that substantial use or construction for each phase of the project had to begin within one year. Indeed, reading the statute this way would make no sense. The purpose of phased construction is to build in stages, not to commence construction of each phase at the start of the over-all project. "In a phased condominium development, groups or stages of units are completed over a period of several years and become part of the condominium by successive amendments to the master deed. 'Phasing' is not a statutory term, but is a usage that has grown out of the general enabling provisions of G. L. c. 183A." *Queler* v. *Skowron*, 438 Mass. 304, 312 n.15 (2002), quoting *Podell* v. *Lahn*, 38 Mass. App. Ct. 688, 689 n.3 (1995). "Phasing of a condominium permits a developer to expand the size and scope of a condominium project in response to market conditions." *Queler* v. *Skowron*, *supra.* While some phased construction projects may, by virtue of design or the nature of the project, require construction of infrastructure that will benefit later phases (e.g., common areas or roadways), nothing in G. L.

c. 40A, § 9, requires this. Additionally, nothing in § 9 indicates that each phase of the project is subject to its own lapse period. Once a special permit for a project, phased or otherwise, has been approved, all that the statute requires is that substantial use or construction commence within the applicable lapse period, which cannot exceed two years.[10]

In a case presenting a similar question, and to which both parties, as well as the judge in the Land Court, have turned for guidance, the Appeals Court determined that, despite an extended pause in construction, a special permit issued to a condominium developer had not lapsed. *Bernstein* v. *Chief Bldg. Inspector & Bldg. Comm'r of Falmouth*, 52 Mass. App. Ct. 422, 427 (2001) (*Bernstein*). In that case, the zoning board of appeals of Falmouth had granted a special permit for the construction of a condominium in five phases. *Id.* at 423. Much of the project involved razing existing buildings and replacing them with new ones. *Id.* at 423-424. The final phase involved the construction of a new building, referred to as building five. *Id.* at 424. During the course of the project, the developer requested and received permission from the board to delay construction of the final phase, and in May, 1993, the board allowed certain modifications to the special permit. *Id.* at 424-425. Four years later, in 1997, the developer prepared to construct building five.[11] *Id.* at 425. The trustees of the condominium objected, on the basis

---

[10]We disagree with the judge's interpretation of G. L. c. 40A, § 9, and the special permit in this regard. He determined that, where a special permit "contemplates separate phases and contains a separate schedule for each phase and a requirement to submit yearly plans, the 'substantial use' must be directly related to that phase for its development rights to be preserved, i.e., substantial steps must have been taken towards the construction or infrastructure of that phase." As we have stated, nothing in the statute or the special permit suggests either that construction or substantial use of each phase must commence within the lapse period or that each phase of a phased construction project is subject to its own lapse period.

[11]The special permit in *Bernstein* v. *Chief Bldg. Inspector & Bldg. Comm'r of Falmouth*, 52 Mass. App. Ct. 422, 424 (2001) (*Bernstein*), was initially approved in 1986. The developer sought and received a modification to the permit in 1987. *Id.* Between 1987 and 1989, four buildings were constructed and a condominium master deed was recorded in October, 1989. *Id.* In 1990, the developer sought to modify the special permit again, but resulting litigation delayed the board's approval of the modifications until 1993. *Id.* at 424-425. Four years later, in 1997, a new developer, who had acquired the development rights, prepared to construct building five, leading to the litigation that

that the special permit had lapsed, but the building commissioner and, in turn the board, the Land Court, and the Appeals Court, rejected the trustees' argument. *Id.* at 425-426. The Appeals Court determined that both substantial use and construction had commenced within the applicable two-year lapse period, noting that the condominium unit owners were "making 'substantial use' of the construction thus far completed . . . e.g., the common areas" and that the "last phase of the project began in 1990 with the installation of a septic system designed to serve building five." *Id.* at 428.

Here, the board argues that, unlike in the *Bernstein* case, no such substantial use has occurred. In fact, it points out that, when given the opportunity to reserve capacity in the municipal sewer system for the additional units that would be constructed as part of phases III and IV, the plaintiffs, through their predecessor, failed to do so. In response, the plaintiffs argue that the installation of the septic system in the *Bernstein* case for building five, in 1990, had no bearing on or relevance to the question whether the special permit, issued in 1986, had lapsed in 1990.

Regardless whether the court's assessment in the *Bernstein* case that substantial use had commenced was based on the installation of the sewer system or on some other factor (e.g., unit owners' making use of common areas), the court clearly determined that substantial use had commenced. The court went on to conclude that "where a developer anticipates completing work in stages, has begun construction within two years, and a 'substantial use' has commenced, authority to complete the project continues *absent express language to the contrary* in the permit" (emphasis added). *Id.* at 427. We do not interpret this to mean that both substantial use and construction must commence to avoid lapse of a special permit. In the *Bernstein* case, both had occurred, but, as we stated previously, G. L. c. 40A, § 9, is in the disjunctive — either substantial use or construction must commence to avoid lapse. The statute does not require both. The *Bernstein* court's observation that in a phased construction project where the special permit does not expressly include an outside time limit for com-

resulted in the *Bernstein* case. *Id.* Although the delay in the *Bernstein* case was shorter than the delay here, the period of inactivity in that case was twice the applicable lapse period (i.e., four years).

pletion of the entire project, the authority to complete the project "continues" is applicable so long as either substantial use or construction has commenced within the lapse period.[12] Here, where construction of the project began within one year of special permit approval and where the special permit contains no time limit, there is no basis to conclude that the special permit has lapsed. Cf. *New Seabury Corp.* v. *Board of Appeals of Mashpee*, 28 Mass. App. Ct. 946, 948 (1990) (plaintiff granted special permit to develop property according to cluster zoning principles constrained only by density and minimum time conditions relative thereto where board did not, "as it could have" under G. L. c. 40A, § 9, impose condition, safeguard, or limitation on time or use of permit).

The *Bernstein* court recognized that a special permit should not ordinarily be "warehoused indefinitely." *Bernstein, supra.* The two-year lapse period set forth in G. L. c. 40A, § 9, and parallel municipal bylaws aim to prevent such warehousing. Municipal planning boards or other special permit granting authorities concerned about lengthy delays in phased construction projects can alleviate such concerns by including an express time limitation as a condition of approval of a special permit for a phased construction project.[13] Section 9 itself contemplates such a measure by providing that authorities granting special permits

[12]This does not mean, of course, that in a phased project where substantial use or construction has commenced in accordance with G. L. c. 40A, § 9, and any applicable municipal bylaw, that after a hiatus has occurred, a developer will automatically be able to recommence construction. General Laws c. 40A, § 6, requires that "construction or operations under a . . . special permit shall conform to any subsequent amendment of the ordinance or by-law unless the use or construction is commenced within a period of not more than six months after the issuance of the permit and in cases involving construction, unless such construction is continued through to completion as continuously and expeditiously as is reasonable." A developer thus may be required to comply with, and conform the project to, any changes in the applicable bylaws. In this case, the plaintiffs have not yet received approval of their development plan, which seeks to build additional condominium units (i.e., to resume the construction approved by the special permit). Because the board determined that the special permit had lapsed, it did not decide whether the plaintiffs' plan was otherwise in compliance with applicable bylaws. Thus, even though we today determine that the special permit has not lapsed, the plaintiffs still require further approval from the board before they may proceed.

[13]Other means of monitoring a special permit exist as well. A special permit granting authority could, for example, include as a condition of approving a

"may . . . impose conditions, safeguards and limitations on time or use." No such limitation on time was included in this case.

The board suggests that the special permit did actually contain a limitation because the special permit required that, in the board's view, the project be completed in four years. Condition no. 3 of the special permit requires the developer to submit plans for "Site Plan Review" in "annual phases." The board reads this requirement together with the phased construction detailed in condition no. 5 to mean that the project had to be completed in four years, and that in each year — for each annual phase — the developer had to submit plans to the board for review. Condition no. 5, however, does nothing more than limit the number of units that could be constructed in each phase of the project. Condition no. 3, in turn, simply requires that for each annual phase and for every year that a phase is constructed, the developer must submit a plan to the board for review. Although the developer may have originally contemplated completing the project in four years, nothing in the special permit required it to do so.

Reasons to construct a project in phases may vary. Based on economic concerns or market conditions, a developer may not want to construct an entire condominium project at one time, see *Queler* v. *Skowron*, 438 Mass. 304, 312 n.15 (2002), or a municipality might prefer phased construction in order to absorb more gradually the new homes and infrastructure into the community. Whatever the reason, the phases contemplated by the special permit in this case are limited only by the number of units that can be constructed in each phase. They are not limited by time (other than the statutory requirement that construction or substantial use commence within two years of special permit approval).

The board also argues that the plaintiffs and their predecessors failed to meet the requirements of the special permit because they did not submit annual plans for review as required by condition no. 3. It is true that after submitting plans for review

special permit that the permit be periodically reviewed or that the permit is nontransferable. See *Hopengarten* v. *Board of Appeals of Lincoln*, 17 Mass. App. Ct. 1006, 1006 (1984) (special permit allowing plaintiff to erect noncommercial radio tower on his property required that permit be reviewed every three years and that the permit "remain exclusively with the petitioner and . . . not [be] transferable nor run with the land").

relevant to phases I and II, the plaintiffs' predecessor did not submit any further plans. But when phase III of the project did not go forward, there was no need to submit a plan to the board for review. Once construction stopped, after phase II, there was simply no reason to continue to submit site plans for review where no further construction was yet planned.[14]

Because we conclude that the special permit did not lapse, on the basis of our interpretation of G. L. c. 40A, § 9; § 1550 of the bylaw; and the special permit, we do not consider the plaintiffs' arguments regarding a condominium association's right to revive expired development rights pursuant to G. L. c. 183A, § 5 (*b*) (2) (iii).[15]

3. *Conclusion.* The board denied the plaintiffs' application for a special permit modification on the basis that the special permit had lapsed and due to an unresolved issue regarding ownership of the condominium development rights. The latter issue is not before us and was decided in the plaintiffs' favor by the Land Court. We conclude, on the only issue before us and also in the plaintiffs' favor, that the special permit has not lapsed. Judgment shall enter in the Land Court remanding the case to the board for further proceedings consistent with these opinions and to address any issues that might now be revived.[16]

*So ordered.*

---

[14]To the extent that the plaintiffs argue that the board did not rely on any claimed failure to comply with condition no. 3 as a basis to deny "zoning relief," we disagree. Although the board's brief decision does not mention condition no. 3, the minutes of the board meeting at which the plaintiffs' special permit modification application was considered indicate that "lack of submission of plans annually as required by the Special Permit" was discussed.

[15]We also do not consider the board's assertion that the special permit lapsed under § 4454 of the bylaw because the association transferred its rights under the special permit to the association and, prospectively, to Lobisser. The board's three-sentence, conclusory argument does not rise to the level of acceptable appellate argument, and we need not address it. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). See also, e.g., *Greater Media, Inc.* v. *Department of Pub. Utils.*, 415 Mass. 409, 418 (1993).

[16]In addition to denying the plaintiffs' application for a modification of the special permit, the board also denied the plaintiffs' application for development plan approval. The basis for denial of the latter was that the plaintiffs did not have a valid special permit. Given our decision that the special permit has not lapsed, the board may now need to address the other issues raised in the plaintiffs' application.